Nos. 23-1647; 23-1781

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

OI EUROPEAN GROUP, B.V.,
*Appellee,*

v.

BOLIVARIAN REPUBLIC OF VENEZUELA,
*Appellee,*

PETRÓLEOS DE VENEZUELA, S.A.,
*Appellant.*

OI EUROPEAN GROUP, B.V.,
*Appellee,*

v.

BOLIVARIAN REPUBLIC OF VENEZUELA,
*Appellant.*

On Appeal from the United States District Court for the District of Delaware
Misc. No. 19-290 (Hon. Leonard P. Stark, United States Circuit Judge)

## OPENING BRIEF OF THE BOLIVARIAN REPUBLIC
## OF VENEZUELA

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Sarah E. Weiner
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001-5369
(202) 220-1100
*Counsel for the Bolivarian Republic of Venezuela*

## CORPORATE DISCLOSURE STATEMENT

The Bolivarian Republic of Venezuela is a foreign sovereign, not a corporation, and is therefore not covered by Federal Rule of Appellate Procedure 26.1, which requires a disclosure by a "nongovernmental corporation," or Third Circuit LAR 26.1, which requires a disclosure by a "corporation."

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................................... i

INTRODUCTION ......................................................................................... 1

STATEMENT .............................................................................................. 4

SUMMARY OF ARGUMENT ...................................................................... 14

ARGUMENT .............................................................................................. 17

I.     THE DISTRICT COURT ERRED IN HOLDING THAT PDVSA IS
SUBJECT TO JURISDICTION BECAUSE IT IS THE ALTER EGO
OF THE REPUBLIC ................................................................................. 17

     A.    Standard of review ........................................................................... 18

     B.    A government-created enterprise enjoys a strong presumption
of juridical independence that may be overcome only by a
showing of day-to-day domination far exceeding ordinary
governmental control ........................................................................ 19

     C.    The district court treated ordinary incidents of PDVSA's status
as a state-owned instrumentality as evidence of complete
domination. ...................................................................................... 22

     D.    The *Bancec* factors confirm that PDVSA is not Venezuela's
alter ego .......................................................................................... 26

          1.    The level of economic control by the government ................... 27

          2.    Whether the entity's profits go to the government ................... 32

          3.    The degree to which government officials manage the
entity or otherwise have a hand in its daily affairs ................. 33

          4.    Whether the government is the real beneficiary of the
entity's conduct .................................................................... 36

          5.    Whether adherence to separate identities would entitle
the foreign state to benefits in United States courts while
avoiding its obligations ......................................................... 38

     E.    The Maduro regime's control of PDVSA in Venezuela is
irrelevant ......................................................................................... 40

# TABLE OF CONTENTS
### (Continued)

**Page**

II.    EVEN ASSUMING THAT PDVSA WERE NOT ENTITLED TO FSIA IMMUNITY, PDVSA'S PROPERTY IS NOT SUBJECT TO ATTACHMENT TO SATISFY THE REPUBLIC'S JUDGMENT DEBTS ...................................................................................42

    A.    Standard of review ..............................................................42

    B.    This Court has pendent appellate jurisdiction to review the district court's ruling that PDVSA's property is subject to attachment ..........................................................................42

    C.    Under Federal Rule of Civil Procedure 69, PDVSA's property may not be attached to satisfy a judgment against the Republic ........45

        1.    Appellees have not proved fraud or similar injustice, as Delaware law requires.............................................46

        2.    The District Court incorrectly applied federal common law ...................................................................50

CONCLUSION .......................................................................56

CERTIFICATE OF BAR MEMBERSHIP...............................................58

CERTIFICATE OF COMPLIANCE....................................................59

CERTIFICATE OF SERVICE ........................................................60

CERTIFICATE OF ELECTRONIC FILING..........................................61

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Animal Science Prods., Inc. v. Hebei Welcome Pharmaceutical Co.*,
  138 S. Ct. 1865 (2018) ...................................................................28

*Arch Trading Corp. v. Republic of Ecuador*,
  839 F.3d 193 (2d Cir. 2016) ..................................................29, 30, 33

*Aurelius Cap. Master, Ltd. v. Republic of Argentina*,
  589 F. App'x 16 (2d Cir. 2014) ........................................................44

*Bank of Nova Scotia v. United States*,
  487 U.S. 250 (1988)........................................................................51

*Bright v. United States*,
  603 F.3d 1273 (Fed. Cir. 2010) ........................................................51

*Cassirer v. Thyssen-Bornemisza*,
  142 S. Ct. 1502 (2022)...............................................................50, 54

*City of Milwaukee v. Illinois & Michigan*,
  451 U.S. 304 (1981)..................................................................48, 53

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  2021 WL 129803 (D. Del. Jan. 14, 2021) ...............................9, 10, 56

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  24 F.4th 242 (3d Cir. 2022) .....................................................*passim*

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  333 F. Supp. 3d 380 (D. Del. 2018)..........................................*passim*

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  932 F.3d 126 (3d Cir. 2019) .....................................................*passim*

*CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*,
  381 F.3d 131 (3d Cir. 2004) ......................................................42, 44

*Doe v. Holy See*,
  557 F.3d 1066 (9th Cir. 2009) ........................................................35

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Dole Food Co. v. Patrickson,*
   538 U.S. 468 (2003)......................................................................41

*EM Ltd. v. Banco de la Republica Argentina,*
   800 F.3d 78 (2d Cir. 2015) ......................................................*passim*

*First National City Bank v. Banco Para El Comercio Exterior de*
   *Cuba,*
   462 U.S. 611 (1983).................................................................*passim*

*Flatow v. Islamic Republic of Iran,*
   308 F.3d 1065 (9th Cir. 2002) ...........................................20, 29, 35

*Foremost-McKesson, Inc. v. Islamic Republic of Iran,*
   905 F.2d 438 (D.C. Cir. 1990)....................................................53

*Gater Assets Ltd. v. AO Moldovagaz,*
   2 F.4th 42 (2d Cir. 2021) ........................................................23, 31

*Harrison v. Soroof Int'l, Inc.,*
   320 F. Supp. 3d 602 (D. Del. 2018)..............................................48

*Hester Int'l Corp. v. Fed. Republic of Nigeria,*
   879 F.2d 170 (5th Cir. 1989) .......................................................32

*Hozier v. Midwest Fasteners, Inc.,*
   908 F.2d 1155 (3d Cir. 1990) ......................................................51

*Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.,*
   356 F.3d 731 (7th Cir. 2004) .......................................................48

*Janvey v. Libyan Inv. Auth.,*
   840 F.3d 248 (5th Cir. 2016) .......................................................53

*Jones v. Brown,*
   461 F.3d 353 (3d Cir. 2006) ........................................................43

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Kamen v. Kemper Fin. Servs., Inc.*,
   500 U.S. 90 (1991)..........................................................................52

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas*
   *Bumi Negara*,
   313 F.3d 70 (2d Cir. 2002) ...........................................................47

*Katzir's Floor & Home Design, Inc. v. M-MLS.com*,
   394 F.3d 1143 (9th Cir. 2004) ......................................................48

*Keifer & Keifer v. Reconstruction Fin. Corp.*,
   306 U.S. 381 (1939)......................................................................25

*Leucadia, Inc. v. Applied Extrusion Techs., Inc.*,
   998 F.2d 157 (3d Cir. 1993) .........................................................51

*Mohammad Ladjevardian, Laina Corp. v. Republic of Argentina*,
   663 F. App'x 77 (2d Cir. 2016) ....................................................23

*Montanez v. Thompson*,
   603 F.3d 243 (3d Cir. 2010) .........................................................42

*N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*,
   801 F.3d 369 (3d Cir. 2015) .........................................................50

*NML Capital, Ltd. v. Banco Central*,
   652 F.3d 172 (2d Cir. 2011) .........................................................24

*Pac. Reinsurance Mgmt. Corp. v. Fabe*,
   929 F.2d 1215 (7th Cir. 1991) ......................................................47

*Palcko v. Airborne Express, Inc.*,
   372 F.3d 588 (3d Cir. 2004) ..............................................43, 44, 45

*PDVSA US Litig. Tr. v. LukOil Pan Americas LLC*,
   65 F.4th 556 (11th Cir. 2023) .......................................................41

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Pearson v. Component Tech. Corp.*,
    247 F.3d 471 (3d Cir. 2001) ...............................................................24

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) ...........................................................47

*Republic of Argentina v. NML Capital, Ltd.*,
    573 U.S. 134 (2014)............................................................................46

*Rubin v. Islamic Republic of Iran*,
    138 S. Ct. 816 (2018).................................................................21, 22

*Schreiber v. Kellogg*,
    50 F.3d 264 (3d Cir. 1995) ..........................................................46, 47

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
    899 F.3d 1064 (9th Cir. 2018) ...........................................................23

*Sears, Roebuck & Co. v. Sears plc*,
    744 F. Supp. 1297 (D. Del. 1990).......................................................49

*Seijas v. Republic of Argentina*,
    502 F. App'x 19 (2d Cir. 2012) ............................................25, 33, 37

*Showan v. Pressdee*,
    922 F.3d 1211 (11th Cir. 2019) .........................................................51

*Sys. Div., Inc. v. Teknek Elecs., Ltd.*,
    253 F. App'x 31 (Fed. Cir. 2007) ......................................................48

*Transamerica Leasing v. La Republica de Venezuela*,
    200 F.3d 843 (D.C. Cir. 2000)..............................................19, 23, 25

*Trust v. Kummerfeld*,
    153 F. App'x 761 (2d Cir. 2005) .......................................................48

*United States v. Miller*,
    229 F.2d 839 (3d Cir. 1956) ..............................................................48

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*United States v. Spears*,
859 F.2d 284 (3d Cir. 1988) ...............................................................45

*United States v. Yazell*,
382 U.S. 341 (1966)............................................................................47

*Verlinden B.V. v. Central Bank of Nigeria*,
461 U.S. 480 (1983)..............................................................................5

*Walker Int'l Holdings, Ltd. v. Republic of Congo*,
415 F.3d 413 (5th Cir. 2005) ..............................................................47

*Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*,
965 F.2d 1375 (5th Cir. 1992) ............................................................44

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015)................................................................................41

STATE CASES

*Buechner v. Farbenfabriken Bayer Aktiengesellschaft*,
154 A.2d 684 (Del. 1959) ..............................................................47, 49

*Crosse v. BCBSD, Inc.*,
836 A.2d 492 (Del. 2003) ...................................................................49

*Jiménez v. Palacios*,
250 A.3d 814 (Del. Ch. 2019) ..............................................................6

*Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*,
752 A.2d 1175 (Del. Ch. 1999) ..........................................................49

FEDERAL STATUTES

28 U.S.C. § 1330(a) ..................................................................................5

28 U.S.C. § 1604......................................................................................5

28 U.S.C. §§ 1605-1607 ...........................................................................5

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

28 U.S.C. § 1605(a)(6) ....................................................................8

28 U.S.C. § 1606 .......................................................47, 48, 52, 54

28 U.S.C. § 1609 ............................................................................5

28 U.S.C. §§ 1610-1611 ...............................................................5

28 U.S.C. § 1963 ............................................................................3

28 U.S.C. § 2072(b) ....................................................................51

**STATE STATUTES**

8 Del. C. § 324 ............................................................................11

8 Del. C. § 324(a) .......................................................................47

8 Del. C. § 5031 .....................................................................11, 47

**RULES**

Fed. R. Civ. P. 5(d) .....................................................................51

Fed. R. Civ. P. 23.1 .....................................................................52

Fed. R. Civ. P. 26(c) ...................................................................51

Fed. R. Civ. P. 44.1 .....................................................................28

Fed. R. Civ. P. 69 ..................................................................*passim*

# INTRODUCTION

This appeal arises out of Appellees' efforts to enforce judgments against the Republic of Venezuela by seeking to attach and execute on the assets of PDVSA, an independent sovereign instrumentality of the Republic.  In the decision under review, the district court concluded that it could assert jurisdiction over PDVSA, and order the attachment of PDVSA's assets, on the theory that PDVSA was the Republic's alter ego and therefore could not assert the sovereign immunity to which it would otherwise be entitled under the Foreign Sovereign Immunities Act ("FSIA").  That holding rests on two extraordinary and unprecedented rulings that are wrong as a matter of law, lack any basis in the record, and threaten to destabilize settled principles of foreign sovereign immunity.

First, the district court disregarded the strong presumption in favor of PDVSA's juridically independent status based on nothing more than the ordinary incidents of government-owned entities—such as sovereign ownership of natural resources and of the entity itself, policy coordination between the sovereign and the entity, the sovereign's appointment of directors to the entity's board, and the like. Under binding Supreme Court precedent, however, such ordinary incidents cannot be the basis for finding an alter-ego relationship that justifies piercing the corporate veil.  *See First National City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983).  At the same time, the district court gave short

shrift to the comprehensive steps taken starting in 2019 by Interim President Guaidó and the Interim Government to ensure that PDVSA operates autonomously and according to commercial principles, free from the day-to-day economic control exercised by the prior Maduro and Chávez regimes.  In essence, the district court treated the legitimate actions of the Interim Government to restore and respect PDVSA's independence as no different from the Maduro regime's corrupt domination of PDVSA.

Second, the district court ruled that in authorizing attachment of PDVSA's assets it was free to disregard the express terms of Federal Rule of Civil Procedure 69(a) governing execution and related proceedings.  Rule 69(a) unambiguously provides that state law (here, Delaware law) governs such proceedings.  Delaware law, in turn, unambiguously provides that assets held by an entity that is not the judgment debtor may be attached only if that entity's corporate veil is pierced, which in turn requires a showing that the entity is a sham designed to defraud creditors—a showing that the creditors in these cases did not even attempt to make.  Rather than apply that clear state law, the district court instead ruled that federal common law controls and that the attachments were proper on the same (erroneous) alter-ego analysis that supported the court's FSIA jurisdictional ruling.  By perversely treating foreign sovereign instrumentalities less favorably than their private counterparts,

that ruling flies in the face of Rule 69(a), which has the force and effect of a statute, and of the FSIA itself.

## JURISDICTIONAL STATEMENT

The district court exercised subject-matter jurisdiction pursuant to 28 U.S.C. § 1963.

The district court entered the orders at issue on March 23 and 31, 2023. PDVSA filed notices of appeal on April 6, 2023, in D. Del. Nos. 19-mc-290, 20-mc-257, 21-mc-46, 21-mc-481, 22-mc-156, and 22-mc-453. The Republic filed a notice of appeal on April 24, 2023, in D. Del. No. 19-mc-290.

This Court has jurisdiction under the collateral-order doctrine to review the district court's rejection of PDVSA's assertion of sovereign immunity under the FSIA, *see* 932 F.3d 126, 136 (3d Cir. 2019); pp. 17-42, *infra*, and pendent appellant jurisdiction to review the district court's ruling that PDVSA's property is subject to attachment to satisfy the Republic's judgment debts, *see* pp. 46-57, *infra*.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in concluding that PDVSA is not entitled to immunity under the FSIA because it is the Republic's alter ego.  JA65-76.

2.    Whether the district court erred in concluding that property belonging to PDVSA, which is not liable under any judgment, is subject to attachment to satisfy the Republic's judgment debts.  JA80, JA83.

## STATEMENT OF RELATED CASES

This Court previously denied petitions for leave to appeal in this case in Nos. 22-8025 and 22-8027.  Otherwise, this case has not previously been before this Court, and no previous or pending appeal arose out of the same case or proceeding.

The present consolidated appeals are related to award confirmation proceedings in Nos. 16-cv-1533 (D.D.C.), 02-cv-785 (S.D. Miss.), 19-cv-9014 (S.D.N.Y.), 16-cv-2020 (D.D.C.), 17-cv-2559 (D.D.C.), and 14-cv-2014 (D.D.C.).

In addition, several other cases pending in federal district court in Delaware may be affected by this appeal:  Nos. 15-cv-1082-LPS, 16-cv-0904-LPS, 16-cv-1007-LPS, 17-cv-0028-LPS, 17-mc-151-LPS, 19-cv-0290-LPS, and 19-mc-0342-LPS.  This Court has previously considered appeals from some of those cases in Nos. 18-2797, 18-2889, and 18-3124, *see* 932 F.3d 126 (3d Cir. 2019), and Nos. 21-1276, 21-1277, and 21-1289, *see* 24 F.4th 242 (3d Cir. 2022).

## STATEMENT

1.  ***The FSIA.***  The FSIA establishes "a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies or instrumentalities."  *Verlinden B.V. v. Central*

*Bank of Nigeria*, 461 U.S. 480, 488 (1983).  The FSIA provides that a foreign state and its instrumentalities "shall be immune from the jurisdiction" of federal courts except as provided by certain exceptions.  28 U.S.C. § 1604; *see id.* §§ 1330(a), 1605-1607.  Jurisdiction is proper only if a plaintiff establishes that one of those exceptions applies.  *See Verlinden*, 461 U.S. at 488.  The FSIA also provides that property of a foreign state or its instrumentalities is "immune from attachment[,] arrest[,] and execution" unless an exception applies.  28 U.S.C. § 1609; *see id.* §§ 1610-1611.

As the Supreme Court recognized in *Bancec*, "duly created instrumentalities of a foreign state," like separate corporate entities, "are to be accorded a presumption of independent status."  462 U.S. at 627.  As a result, ordinarily a person who obtains a judgment against a foreign state cannot satisfy that judgment by executing against the property of that state's instrumentalities, which are entitled to their own FSIA immunity.  *See id*.  That presumption of separateness may be overcome only if (a) the instrumentality is so "extensively controlled" by the foreign state that it is "complete[ly] dominat[ed]," or (b) recognizing the instrumentality's separate juridical status would "work fraud or injustice."  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 140, 143 (3d Cir. 2019) ("*Crystallex II*") (citations omitted); *see Bancec*, 462 U.S. at 629.

**2.** *Venezuela, its instrumentalities, and its government.* PDVSA is a state-owned oil company that is an "instrumentality" of the Bolivarian Republic of Venezuela ("Venezuela" or "the Republic") within the meaning of the FSIA. JA3476. PDVSA owns the shares of PDV Holding ("PDVH"), a Delaware corporation, which is the holding company for CITGO Holding, Inc., which in turn owns CITGO Petroleum Corp., a leading U.S. refining company. JA3478. CITGO has long served as an important foreign-trade conduit for Venezuelan oil.

In 2013, Nicolas Maduro succeeded Hugo Chávez as President of Venezuela. JA8161; 932 F.3d at 135. Both presidencies were marked by extensive corruption and maladministration, including with respect to PDVSA. JA5799-5800; *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 407-08 (D. Del. 2018) ("*Crystallex I*").

In January 2019, Venezuela's National Assembly declared Maduro's presidency illegitimate. *Jiménez v. Palacios*, 250 A.3d 814, 819 (Del. Ch. 2019). On January 10, 2019, National Assembly President Juan Guaidó became the Interim President pursuant to Article 233 of the Venezuelan Constitution. JA9366 ¶ 4. Shortly thereafter, the United States recognized Guaidó as Interim President and rejected the legitimacy of the Maduro regime. JA6064. In 2022, the United States reaffirmed its recognition of Guaidó, as well as of "the authority of the

democratically elected 2015 National Assembly as the last remaining democratic institution" in Venezuela.[1] JA5140-41.

As relevant here, to "establish a legal framework to govern a democratic transition in the Bolivarian Republic of Venezuela," in February 2019 the National Assembly enacted the "Statute to Govern a Transition to Democracy to Reestablish the Full Force and Effect of the Constitution" (the "Democracy Transition Statute"). JA6065.  Article 15 of the Democracy Transition Statute authorized Guaidó to "[a]ppoint *ad hoc* Administrative Boards" of state-owned corporations and other entities "for the purpose of . . . adopting the measures necessary to control and protect State company assets." *Id.*  Invoking that authority, Guaidó appointed an ad hoc administrative board of PDVSA, and the National Assembly ratified the appointments.  JA6067.

In April 2019, Guaidó issued Presidential Decree No. 3, which granted PDVSA's Ad Hoc Board "new responsibilities and duties." JA6068; JA6688; JA6699; JA6751.  The Decree forbids the Ad Hoc Board from "follow[ing] political or partisan guidelines" and orders it to "exercise the powers conferred herein

---

[1] In January 2023, the National Assembly dissolved Guaidó's interim government, and the United States subsequently reaffirmed its recognition of the National Assembly.  The United States continues to view Maduro as illegitimate, even though he controls assets located within Venezuelan territory.  JA6568-75.  The parties stipulated that the 2023 changes had no material effect on the resolution of the alter-ego issue.  JA61; JA6043; JA8576-79.

autonomously and independently, following only technical criteria aimed at the efficient management of PDVSA's direct and indirect subsidiaries organized abroad." JA6068-69.

PDVSA's Ad Hoc Board has accordingly maintained strict independence from the Republic. PDVSA sends the National Assembly periodic reports but does not take orders from any government official. JA6689-90.

**3.** *The* **Crystallex** *litigation.* In 2016, Crystallex International Corporation ("Crystallex") sued Venezuela in D.C. federal district court to confirm an arbitration award entered against the Republic based on an expropriation by then-president Chávez. No. 16-cv-661 (D.D.C.), Dkt. No. 1. Exercising jurisdiction under an FSIA exception to immunity for confirming arbitration awards, 28 U.S.C. § 1605(a)(6), the court confirmed the award and issued a judgment, which Crystallex then registered in Delaware district court. Crystallex named only the Republic as the defendant, but asked the court to attach and sell PDVSA's U.S.-based assets. No. 17-mc-151, Dkt. Nos. 1-2.

In 2018, before Guaidó became Interim President, the district court ruled that PDVH shares owned by PDVSA could be attached to satisfy Crystallex's judgment. The court acknowledged that the Republic and PDVSA are legally separate and that PDVSA had no connection to the underlying dispute. *Crystallex I*, 333 F. Supp. 3d at 403. The court further acknowledged that PDVSA, as an instrumentality of

Venezuela, is presumptively immune under the FSIA. *Id.* at 395-96. But the court concluded that PDVSA was Venezuela's alter ego—and therefore could be subjected to FSIA jurisdiction on the same basis as the Republic—on the ground that Venezuela exercised "extensive control" over PDVSA. *Id.* at 401-03, 414. The court based its decision solely on the Maduro and Chávez regimes' day-to-day domination of PDVSA. *Id.* at 396, 401. The court also ruled that PDVSA's shares in PDVH were not immune under the FSIA and authorized the issuance of a writ of attachment. *Id.* at 425-26.

In July 2019, this Court affirmed, relying solely on the facts arising from the Maduro and Chávez regimes (the only facts in the record). *Crystallex II*, 932 F.3d at 146-49. Applying *Bancec*, the Court concluded that jurisdiction over PDVSA was proper because PDVSA was the Republic's alter ego. *Id.* at 138. The parties did not discuss, and the Court did not address, whether attachment would be proper under Federal Rule of Civil Procedure 69(a) and Delaware law if the jurisdictional determination were upheld.

On remand, the district court established procedures for the sale of PDVH shares. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2021 WL 129803, at *1 (D. Del. Jan. 14, 2021) ("*Crystallex III*"). The court rejected PDVSA's motion, joined by PDVH and CITGO, to quash the writ of attachment. Those parties argued that Delaware alter-ego law governed whether attachment was

proper under Rule 69(a); that Delaware law requires showing fraud or similar injustice, not just extensive control, to pierce the corporate veil of an entity like PDVSA that is not itself liable for any judgment; and that the attachment issue was separate from the previously resolved jurisdictional immunity issues. *Id.* at *8. The court held that this Court had already affirmed the attachment's validity, even though it had previously addressed only issues of jurisdictional immunity, and that PDVSA and others had failed to preserve the Delaware-law issue. *See id.* at *9-*15. The district court thus never determined whether an attachment must satisfy Delaware veil-piercing procedures pursuant to Rule 69(a).

This Court dismissed the resulting appeal for lack of appellate jurisdiction. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242 (3d Cir. 2022) ("*Crystallex IV*"). The Court held that the district court's refusal to quash the attachment based on "conflict[] with Delaware alter[-]ego law" and its "decision to determine final sale procedures in the future" were not appealable final decisions. *Id.* at 249.

**4. *Proceedings below.*** These consolidated appeals involve six judgments against the Republic registered in the District of Delaware for execution purposes.[2]

_____

[2] D. Del. Case Nos. 19-mc-290 ("*OIEG* Action"), 20-mc-257 ("*Huntington* Action"), 21-mc-46 ("*ACL* Action"), 21-mc-481 ("*Rusoro* Action"), 22-mc-156 ("*Koch* Action"), and 22-mc-453 ("*Gold Reserve* Action"). One of the judgments is against the Republic's Ministry of Defense, to which the term "Republic" also refers for purposes of this brief.

The judgments confirm arbitral awards stemming from various disputes, including expropriation of property by then-president Chávez. The judgments are held by OI European Group B.V. ("OIEG"); Northrop Grumman Ship Systems, Inc. (now known as Huntington Ingalls Inc.) ("Huntington"); ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd. (collectively, "ACL"); Rusoro Mining, Ltd. ("Rusoro"); Koch Minerals Sàrl and Koch Nitrogen International Sàrl (collectively, "Koch"); and Gold Reserve Inc. ("Gold Reserve"). This brief refers to the judgment creditors as "Appellees."

a. Appellees sought writs of attachment against PDVSA's shares of PDVH so that they can sell the shares to satisfy their judgments against the Republic. *See* 8 Del. C. § 324; 10 Del. C. § 5031; Fed. R. Civ. P. 69(a)(1).

OIEG moved for a writ of attachment in November 2019—after Guaidó became Interim President. JA224. The court's jurisdiction over PDVSA turned— as it had in *Crystallex*—on whether PDVSA could be considered the Republic's alter ego for purposes of FSIA immunity.

OIEG argued that the Republic was collaterally estopped from claiming FSIA immunity based on *Crystallex I*. The district court disagreed, finding "things are not at all the same" as they were under the Maduro regime when *Crystallex I* was decided. JA5539; JA5542. Because the Republic was "under a new legal regime"

headed by Guaidó, JA5539, the court required OIEG to independently prove "that PDVSA is the alter ego of Venezuela." JA5542.

Huntington, ACL, and Rusoro also registered their judgments in the District of Delaware and sought writs attaching PDVSA's shares of PDVH. JA232; JA236; JA248.

PDVSA intervened in all four actions and moved to dismiss for lack of FSIA jurisdiction. *E.g.*, JA6029; JA6045. As to the validity of attachment, PDVSA cited Federal Rule of Civil Procedure 69(a), which provides that "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located" unless a federal statute otherwise provides, Fed. R. Civ. P. 69(a); argued that Delaware law governs; and contended that, unlike the *Bancec* analysis governing jurisdictional immunity, Delaware law precludes attaching PDVSA's property in the absence of both extensive control *and* fraud or similar injustice. *E.g.*, No. 19-mc-290, Dkt. No. 65, at 8-35.

While those motions were pending, Koch and Gold Reserve similarly registered judgments in the District of Delaware and sought writs of attachment.

JA259; JA263.  PDVSA intervened, and the parties stipulated that the district court's decision on the pending motions would govern.  JA85; JA6034; JA6040; JA6043.[3]

     b.  In March 2023, the district court ruled that it had jurisdiction to issue writs of attachment against PDVSA's shares in PDVH, concluding that PDVSA was not immune from suit and its assets were not immune from execution under the FSIA. JA62-83.  Applying *Bancec*, the court deemed the Guaidó regime to have exercised "extensive control" over PDVSA, and stated that the same result would obtain if the Maduro regime's actions were examined.  JA67-68; JA71-72; JA76.  Because the existence of "extensive control" was sufficient to support its ruling, the court did not directly address *Bancec*'s alternative "fraud" prong, but it "adopt[ed] and incorporate[d] by reference its holding and analysis" from *Crystallex I*, JA80, which found that there was no basis to conclude that the Republic "used PDVSA as an instrument to defraud."  *Crystallex I*, 333 F. Supp. 3d at 403-04.

     The court did not decide whether attachment of PDVSA's property is permissible under Rule 69(a) and Delaware law.  Instead, the court purported to "adhere[] to" *Crystallex I* and *II*, which the court believed "rejected" the contention "that Delaware law applies to this proceeding."  JA80.

---

[3] The Republic appeared in the *OIEG* Action, but not in the others.  The Republic adopted PDVSA's arguments in the *OIEG* Action.  Dkt. No. 69, at 2.

In all six cases, the court entered orders "authorizing the issuance of a writ of attachment."[4]  JA20-22; JA84-86; JA87-89.

c.  PDVSA and the Republic timely appealed.  JA1-16; JA19.

Appellants asked the district court to stay the judgments, including progress toward a sale, pending appeal.  *E.g.*, No. 19-mc-290, Dkt. No. 136.  The court denied the stay.  *E.g.*, No. 19-mc-290, Dkt. No. 146.  This Court entered an administrative stay, referred Appellants' stay motion to the merits panel, and set an expedited briefing schedule.  *See* Order (May 5, 2023), No. 23-1647.  Despite that stay, the district court has allowed Appellees to press their position by making filings in the *Crystallex* action.

## SUMMARY OF ARGUMENT

I.  The district court's ruling that PDVSA is the Republic's alter ego and is therefore not immune from jurisdiction is wrong as a matter of both law and fact and must be reversed.

As a government-owned entity, PDVSA enjoys a strong presumption of juridical separateness from the sovereign.  That presumption can be overcome only

---

[4]  Given U.S. sanctions, the orders are "conditional" on a license from the Office of Foreign Assets Control ("OFAC").  On May 1, 2023, OFAC authorized issuance of writs of attachment for "Additional Judgment Creditor[s]" named by the district court in the *Crystallex* action.  *OIEG* Action, Dkt. No. 147; *see* No. 17-mc-151, Dkt. No. 481.  Over objection, Appellees have asked to have their writs treated as "Additional Judgments." *OIEG* Action, Dkt. No. 150, at 2.  The district court has not acted on that request.

by proof of day-to-day domination far exceeding ordinary governmental control. Under binding Supreme Court precedent, the ordinary attributes of government-owned entities—such as sovereign ownership of natural resources and of the entity itself, policy coordination between the sovereign and the entity, and the sovereign's appointment of directors to the entity's board—cannot overcome the presumption of separateness. The district court committed legal error by placing heavy reliance on those standard attributes in ruling that PDVSA is the Republic's alter ego.

Once those attributes are understood as ordinary and benign, it is clear that none of the factors that properly bear on the alter-ego immunity question supports a finding that PDVSA is the Republic's alter ego. Under Interim President Guaidó, the Republic took extensive steps to ensure that PDVSA operates autonomously and according to commercial principles, free from the day-to-day economic control exercised by the prior Maduro and Chávez regimes. By operation of Venezuelan law, government officials do not have a hand in PDVSA's daily affairs. PDVSA is legally forbidden from using its assets to further the government's interests over its own, and the government does not treat PDVSA's profits as its own. And respecting PDVSA's separateness would not permit the Republic to benefit while inequitably avoiding its obligations. In reaching a different conclusion, the district court misapprehended the governing legal standard and misconstrued Venezuelan law and the relevant documents.

II.  Even assuming that this Court were to affirm the district court's ruling as to PDVSA's immunity from jurisdiction, the district court's order as to attachment of PDVSA's assets must nevertheless be reversed because the court failed to apply Delaware law as required by Federal Rule of Civil Procedure 69(a).

This Court has pendent appellate jurisdiction to address whether PDVSA's property may be attached under Rule 69.  The district court's decision to deny PDVSA immunity from jurisdiction is immediately appealable under the collateral-order doctrine, and that decision is inextricably intertwined with the district court's decision that PDVSA's assets may be attached.  In addition, practical considerations weigh heavily in favor of exercising pendent appellate jurisdiction, because deferring review would encourage piecemeal appeals and occasion extensive district court proceedings that might well be unnecessary.

On the merits of the attachment issue, Delaware law controls, and its requirements for attachment are not satisfied.  Rule 69(a) provides that state law governs proceedings to execute on a judgment (and related proceedings).  Under Delaware law, assets held by an entity that is not the judgment debtor may be attached only if that entity's corporate veil is pierced, which in turn requires a showing that the entity is a sham designed to defraud investors and creditors.  Here, the judgment creditors have not alleged, much less proven, any such fraud.

The district court erroneously declined to consider Delaware law on the attachment issue, instead relying on federal common law and asserting that this Court had previously rejected the applicability of Delaware law. That disregards the binding nature of the Federal Rules, which have the force and effect of a federal statute and therefore cannot be supplanted by federal common law. It also misconstrues this Court's decisions, which have never decided whether Delaware law governs under Rule 69(a).

## ARGUMENT

## I.    THE DISTRICT COURT ERRED IN HOLDING THAT PDVSA IS SUBJECT TO JURISDICTION BECAUSE IT IS THE ALTER EGO OF THE REPUBLIC

As a corporation established by the Republic, PDVSA enjoys a strong presumption of juridical independence that can be overcome only by evidence of complete domination. *Bancec*, 462 U.S. at 627. In *Crystallex II*, this Court acknowledged the conceded fact that the illegitimate Maduro regime had so dominated every aspect of PDVSA's day-to-day affairs that the presumption of independence was overcome. 932 F.3d at 146-49. Subsequently, in 2019, the Interim Government came into existence and, as part of its U.S.-supported efforts to restore democracy and the rule of law in Venezuela, took sweeping action to restore PDVSA's legal and practical independence. The Interim Government enacted statutes and issued decrees protecting PDVSA's autonomy, and established the Ad

Hoc Board to independently manage PDVSA's business outside of Venezuela. Since then, the Board has managed PDVSA and its subsidiaries without governmental interference.

Despite those profound changes, the district court held that PDVSA was so dominated by the Interim Government that it is the government's alter ego—in effect concluding that that the Interim Government's relationship to PDVSA was no different than that of the rogue Maduro regime. To reach that remarkable result, the district court incorrectly treated the routine incidents of PDVSA's status as a government-owned entity (including the government's ownership of PDVSA's stock and PDVSA's mission of acting in the public interest) as evidence of complete domination; misconstrued, and in critical respects ignored altogether, the Interim Government's legislative and executive actions; and inexplicably gave no weight to undisputed record facts refuting the claims of domination advanced by Appellees. The district court's approach would obliterate the strong presumption of juridical independence and strip innumerable state-created instrumentalities of their immunity under U.S. law.

## A.    Standard of review

This Court's review of legal questions, including the ultimate determination of alter-ego status, is *de novo*. *Crystallex II*, 932 F.3d at 136. The district court's factual findings are reviewed for clear error. *Id.*

**B.    A government-created enterprise enjoys a strong presumption of juridical independence that may be overcome only by a showing of day-to-day domination far exceeding ordinary governmental control**

*Bancec* held that "duly created instrumentalities of a foreign state," like separate corporate entities, "are to be accorded a presumption of independent status." 462 U.S. at 627.  That "strong presumption" can be overcome only when (a) the entity in question is so "extensively controlled" by the foreign state that it is "complete[ly] dominat[ed]," or (b) recognizing the instrumentality's separate juridical status would "work fraud or injustice." *Crystallex II*, 932 F.3d at 140, 143; *see Bancec*, 462 U.S. at 629-30.  Appellees have not argued that treating PDVSA as distinct from the Republic would work any fraud or injustice.  They must therefore prove "complete domination" to establish alter-ego status.  *Crystallex II*, 932 F.3d at 144-45.

Such extensive, veil-piercing control is present only under "extraordinary circumstances":  when the government "significantly exceeds the normal supervisory control exercised by any corporate parent over its subsidiary" and exercises control "amount[ing] to complete domination of the subsidiary." *Id.* at 143, 151 (quoting *Transamerica Leasing v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000)); *accord EM Ltd. v. Banco de la Republica Argentina*, 800 F.3d 78, 91 (2d Cir. 2015) ("touchstone inquiry" is "significant and repeated control

over the instrumentality's day-to-day operations"); *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1073 (9th Cir. 2002).

*Bancec* explains what such day-to-day domination does and does not consist of.  As the Supreme Court observed, sovereigns routinely create government instrumentalities that are structured as juridically separate entities and that enjoy day-to-day independence from the government.  *Bancec*, 462 U.S. at 624.  But because those entities are *government* instrumentalities, by definition they carry out *governmental* policies and are supervised by and supported by the government itself.  *Bancec* thus described "a typical government instrumentality, if one can be said to exist," as "created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law."  *Id*.  Governmental selection of the managing board necessarily enables some oversight of the enterprise.  Beyond that, governmental enterprises are subject to "vary[ing]" levels of "control," including in some instances being "subject to the same budgetary and personnel requirements with which government agencies must comply."  *Id*.  In addition, governmental enterprises often have financial ties to the government such as "appropriations to provide capital or to cover losses."  *Id*.  More broadly, because governmental enterprises represent "the efforts of sovereign nations to structure their

governmental activities," those enterprises can be expected to act in coordination with the government to advance governmental policies. *Id*. at 626.

*Bancec* thus recognized that government enterprises are created, supervised, and supported by the government in various respects—yet the Court also held that enterprises bearing those indicia of sovereign supervision and support nonetheless must presumptively be treated as "distinct and independent" from the sovereign, and their separate juridical status respected. *Id*. at 627. The "extensive[] control[]" that *Bancec* held would justify disregarding an entity's juridical status and treating it as an alter ego of the state therefore must go well beyond the level of supervision and coordination that *Bancec* described as normal incidents of a government enterprise. *Id*. at 629. Thus, in *Crystallex II*, this Court found extensive control where it was effectively conceded that the Maduro regime dictated nearly every aspect of PDVSA's everyday business and usurped its profits through irregular means. 932 F.3d at 146.

In determining whether such extensive day-to-day control exists, the Supreme Court has forsworn a "mechanical formula," emphasizing that courts should assess whether an instrumentality's presumptive immunity is overcome "on a case-by-case basis." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 822-23 (2018); *accord Crystallex II*, 932 F.3d at 141; *cf. Bancec*, 462 U.S. at 633 n.27. In conducting that analysis, this Court and others have examined several "*Bancec*" factors: "(1) the

level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations." *Crystallex II*, 932 F.3d at 141 (quoting *Rubin*, 138 S. Ct. at 823). The ultimate question is always whether the sovereign has exercised "complete domination" over the government enterprise. *Id.* at 143. Critically, courts must take care not to find that domination present based on the ordinary attributes of government instrumentalities as described in *Bancec*.

### C. The district court treated ordinary incidents of PDVSA's status as a state-owned instrumentality as evidence of complete domination

The district court did exactly what the Supreme Court in *Bancec* warned against: it concluded that the Interim Government completely dominated PDVSA based largely on the ordinary attributes of government ownership and high-level policy coordination that are the very attributes that *Bancec* treated as *insufficient* to overcome the presumption of juridical separateness.

**1. *Sovereign ownership of natural resources.*** The district court emphasized that the Venezuelan constitution reserves for the Republic property rights to hydrocarbon deposits within Venezuela's territory. JA43. But the constitution simply embodies the bedrock principle that a sovereign has the right to manage its

natural resources. *See, e.g.*, *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1070 (9th Cir. 2018). Many sovereigns establish state-owned companies to manage their natural resources, JA2573-78, JA2595-2614, JA2644-55, JA2716-28—and if state ownership of the underlying natural resources sufficed to support alter-ego status, every such corporation would be an alter ego of its government. Yet government instrumentalities routinely manage property that originates with the state—and courts routinely decline to treat that fact as suggestive of alter-ego status. *EM*, 800 F.3d at 83-84, 92 (central bank is independent even though it manages state reserves); *Mohammad Ladjevardian, Laina Corp. v. Republic of Argentina*, 663 F. App'x 77, 80 (2d Cir. 2016) (central bank's receipt of proceeds "on behalf of" government did not render bank alter ego).

   **2. *The Republic's ownership of PDVSA.*** The district court also relied on the fact that the Republic is the sole owner of PDVSA. JA43, JA46. But state ownership is such a routine feature of a government-created corporation—particularly one tasked with managing natural resources—that treating an ownership stake as indicative of alter-ego status would, as the D.C. Circuit recognized, render "the presumption of separateness announced in *Bancec* . . . an illusion." *Transamerica*, 200 F.3d at 849. Courts therefore have routinely dismissed the relevance of state ownership in the "extensive control" analysis. *E.g.*, *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 58 (2d Cir. 2021) ("the power of a majority shareholder"

"does not in itself establish extensive control" because "[b]lack letter corporate law provides that a corporation and its controlling shareholder are distinct entities"); *cf. Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) ("[M]ere ownership of a subsidiary does not justify the imposition of liability on the parent.").

For similar reasons, the district court erred in relying on the fact that "as PDVSA's lone shareholder, all profit ultimately runs to the Venezuelan government." JA46.  Receipt of profits is an ordinary incident of the government's sole ownership of PDVSA's stock.  What matters for *Bancec* purposes is not whether the government receives profits from the enterprise, but instead whether it does so in a manner that reflects the government's complete domination of the enterprise. *See* p. 33, *infra*; *NML Capital, Ltd. v. Banco Central*, 652 F.3d 172, 193 (2d Cir. 2011) (Argentina's central bank was legally required to transfer profits to the government); *EM*, 800 F.3d at 94 (Argentina's central bank is juridically independent from the government).

**3.  *Appointment of PDVSA board members*.**  In concluding that the Interim Government manages PDVSA's daily affairs, the district court relied on Venezuelan law's provision that PDVSA's Ad Hoc Board is selected by the government.  JA46-47.  But as *Bancec* itself recognized, such conduct is an inherent attribute of sovereign ownership.  462 U.S. at 624.  "The hiring and firing of board members or officers is an exercise of power incidental to ownership, and ownership of an

instrumentality by the parent state is not synonymous with control over the instrumentality's day-to-day operations."  *EM*, 800 F.3d at 92-93; *Transamerica*, 200 F.3d at 849 ("A sovereign does not create an agency relationship merely by . . . appointing its Board of Directors.").

4. ***Policy coordination between PDVSA and the Interim Government.***  The district court relied heavily on the fact that PDVSA acts in accordance with policies set by the Interim Government, and that PDVSA describes itself as acting for the benefit of the Republic and the Venezuelan people.  JA47 (describing "directive" by Interim Government that PDVSA should "protect[]" CITGO assets to further the "recovery of Venezuela"); JA48-51.  But governments create such instrumentalities to perform the "work of the government"—that is, to further the national interest. *Keifer & Keifer v. Reconstruction Fin. Corp*., 306 U.S. 381, 389 (1939).  *Bancec* therefore recognized that it is utterly unremarkable for government enterprises to coordinate with their governments to achieve the latter's policy goals.  462 U.S. at 625-26.   An instrumentality's pursuit of the public interest as defined by the government, without more, cannot prove that the government dominates the corporation's day-to-day operations.  *E.g.*, *EM*, 800 F.3d at 94 (government's taking "steps to ensure that [central bank] shared its policies and goals" of safeguarding Argentinian financial system did not establish "extensive control" of "day-to-day operations"); *Seijas v. Republic of Argentina*, 502 F. App'x 19, 22 (2d Cir. 2012)

(Argentina-owned bank's following Argentina's policy preferences "does not demonstrate that [the bank] was an alter ego of Argentina").

\* \* \*

The strong presumption of juridical separateness can be overcome only if the Interim Government's control of PDVSA "*significantly exceeds* the normal supervisory control exercised by any corporate parent over its subsidiary" and rises to the level of "complete domination." *Crystallex II*, 932 F.3d at 143 (emphasis added; citation omitted). But here the district court placed paramount reliance on ordinary, widely shared characteristics of government-created and -owned enterprises. Those characteristics by definition cannot demonstrate control that "significantly exceeds" ordinary levels and rises to the level of complete domination. *Id*. Indeed, to affirm the district court's reliance on those attributes would be to threaten a wide range of domestic and foreign government enterprises with judicial disregard of their separate status—a result that cannot be reconciled with *Bancec*'s instruction that "government instrumentalities established as juridical entities distinct and independent from their sovereign should *normally* be treated as such." 462 U.S. at 626-27 (emphasis added).

### D.    The *Bancec* factors confirm that PDVSA is not Venezuela's alter ego

Once the legally insufficient considerations on which the district court focused are excluded, it is obvious that the Interim Government does not exercise

26

anything like the complete domination over PDVSA necessary to justify disregarding its separate status. Indeed, *none* of the *Bancec* factors favors an alter-ego finding.

### 1.    The level of economic control by the government

The first *Bancec* factor asks whether the government "interfere[d] in and dictate[d]" PDVSA's "daily business decisions," thereby controlling its commercial affairs. *EM*, 800 F.3d at 93; *see Crystallex II*, 932 F.3d at 146-47. Here the record establishes the opposite.

a. In 2019, following Guaidó's appointment, Venezuela's National Assembly passed the Democracy Transition Statute, Article 34 of which directs PDVSA and its subsidiaries to "follow commercial efficiency principles," subject only to the "control and accountability processes exercised by the National Assembly, and other applicable control mechanisms." JA46, *see* JA43; JA770; JA5787-88 ("control by PDVSA over [PDVH] is based exclusively on commercial efficiency criteria, rather than political considerations"). That statute ensures PDVSA's commercial autonomy. In addition, Guaidó issued Presidential Decree No. 3, Article 7 of which requires PDVSA's Ad Hoc Board to "autonomously and independently exercise" its powers "following only technical standards aimed at efficiently managing the direct and indirect foreign subsidiaries of PDVSA," and to refrain from using its resources or assets "for the benefit of the Republic." JA5503. Consistent with that legal

framework, the Chair of PDVSA's Ad Hoc Board explained, "no officer of the Interim Government has intervened in the commercial affairs of PDVSA, PDVH, or its subsidiaries by, for example[,] managing production levels, setting prices, selecting customers, or dictating terms of customer relationships." JA6691.

The district court disregarded Presidential Decree No. 3—never once citing Article 7—and seriously misconstrued the Democracy Transition Statute.  This Court reviews the district court's construction of Venezuela law *de novo*, *Animal Science Prods., Inc. v. Hebei Welcome Pharmaceutical Co.*, 138 S. Ct. 1865, 1873 (2018); *accord* Fed. R. Civ. P. 44.1, and the Republic's construction of its own laws is entitled to "substantial" weight, *Animal Science*, 138 S. Ct. at 1875.  The district court misinterpreted Article 34 of the Democracy Transition Statute, which states that PDVSA enjoys commercial autonomy subject to "control and accountability processes exercised by the National Assembly," JA9113 (English translation), as "asserting Venezuela's economic control over PDVSA and PDVSA's assets (and subsidiaries) in the U.S," JA43.  But as used in the operative phrase in the original Spanish—"*mecanismos de control y rendicion de cuentas*," JA9096—the Spanish word "*control*" does not mean "power to direct" or "control."  Rather, it refers to *oversight*—that is, after-the-fact review, not proactive day-to-day management. JA8380:22-JA8381:11 (testimony of Chairman of Ad Hoc Board).  That conclusion is confirmed by reference to other uses of the word "*control*" in the Democracy

Transition Statute.  For example, Article 14 states that "[t]he acts of the Interim President shall be submitted to the parliamentary control of the National Assembly," JA9105 (English translation), which does not mean that the National Assembly exercises *before-the-fact* power over the Interim President's actions.

The after-the-fact oversight that the Democracy Transition Statute actually contemplates falls far short of the *day-to-day* control of PDVSA's affairs necessary to suggest alter-ego status.  Governments routinely engage in oversight of their instrumentalities' actions, and such oversight is entirely consistent with independent operation.  *See, e.g.*, *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 204 (2d Cir. 2016) ("oversight" of transactions and monitoring of "overall compliance" did not constitute day-to-day control under *Bancec*) (citations omitted); *Flatow*, 308 F.3d at 1073 (governmental review of bank's annual reports and other documents constituted "limited" oversight, not day-to-day control).

b.   The district court's remaining bases for concluding that the Republic exercises economic control over PDVSA are equally meritless.

*First*, the court relied on the Republic's ownership of PDVSA and assertion of ownership over Venezuela's natural resources.  Those considerations are irrelevant for the reasons stated above.  *See* pp. 22-23, *supra*.

*Second*, the court asserted that the Interim Government had "tapped" PDVSA funds to "fund its legal fees."  JA44.  But government enterprises routinely loan or

transfer funds to the government. *See, e.g.*, *EM*, 800 F.3d at 93 (central-bank loan to government did not suggest domination because bank followed corporate procedures). The critical question is not whether such a transfer has occurred, but whether it has occurred in a manner showing that the government is "us[ing] [the instrumentality's] resources *as its own*." *Arch Trading*, 839 F.3d at 204 (emphasis added). PDVSA's provision of funds for the Republic's defense was fully consistent with PDVSA's independent status: the funds were a *loan* to the Republic, the loan followed proper Ad Hoc Board authorization protocols, and the Board viewed the transaction as furthering PDVSA's interest in protecting its assets in litigation where those assets were at risk. JA6695-96; *EM*, 800 F.3d at 94. The district court's reliance on the *fact* of the funding, JA44, given this context, is legally insufficient to suggest economic control.

Relatedly, the district court asserted that the Interim Government drew directly on PDVSA's accounts to fund itself and the National Assembly. JA44. That is simply false. The district court based that finding on unsupported hearsay press articles, some relying on anonymous assertions. JA5992-94; JA8248-55. The Chairman of PDVSA's Ad Hoc Board stated under penalty of perjury that no such transfer occurred and that such claims were "false." JA6696. The district court did not even acknowledge that testimony, much less give any reason for refusing to credit it while crediting unsubstantiated anonymous hearsay.

30

*Third*, the district court asserted that Guaidó intended to treat PDVSA's and Venezuela's debt "as one." JA44 (citing JA5669). That assertion is contradicted by the document that the court cited, which states only that the Interim Government would allow the Republic's creditors and other public sector obligors to participate in renegotiations of their claims on "equal terms." JA5669. In other words, both the Interim Government and PDVSA intended to "put in place a coordinated and orderly process for resolving legacy claims by creditors of the Republic and PDVSA." JA6693-94; *see Gater Assets*, 2 F.4th at 61 ("isolated statements" insufficient to establish domination).

*Fourth*, the district court relied on an October 2019 "Agreement on PDVSA Resources" in which the National Assembly authorized PDVSA to use $2 million "on a one-off basis" for its legal defense. JA8205. As the Chairman of the Ad Hoc Board explained, that agreement pertained to expenditures outside PDVSA's ordinary operations, and thus represented a procedural safeguard against potential abuse. JA6695-96. Although the district court construed the agreement to assert the Republic's "control" over PDVSA's "legal decisions," the agreement did not address legal decisions at all. *Contra* JA45; *see* JA48-49. In all events, authorization of extraordinary expenditures does not come close to proving that the Interim Government exercises "day-to-day" control over PDVSA amounting to "complete domination." *EM*, 800 F.3d at 91; *Crystallex II*, 932 F.3d at 143 (citation omitted);

*Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 180 (5th Cir. 1989) (authorization of "external financing"); *contra* JA45-46.

c.   The record is thus devoid of any evidence that the Interim Government exercised day-to-day control over PDVSA's business decisions.  That conclusion is vividly confirmed by a comparison to the circumstances that led this Court in *Crystallex II* to conclude that Maduro exercised extensive control over PDVSA's economic operations.  Maduro required PDVSA to contribute over $4 billion to social programs, and to acquire "food companies" and "electricity generation and distribution companies," among others—initiatives that had nothing to do with PDVSA's actual business.  932 F.3d at 146-47.  The regime dictated "whom PDVSA must sell oil to and at what price," including requiring provision of oil to third parties for free.  *Id.* at 147-48.  The regime also reserved for itself the ability to collect payments for PDVSA's oil from other nations, and "manipulate[d] PDVSA's conversion of U.S. Dollars to Venezuelan Bolivars to leverage PDVSA's revenues." *Id.* at 147.  Nothing like that is true here.

### 2.    Whether the entity's profits go to the government

The Interim Government has not asserted any right to treat PDVSA's profits as its own.  To the contrary, Article 7 of Presidential Decree No. 3 prohibits the Ad Hoc Board from adopting "any resolution that allows for the use of resources or

assets of these subsidiaries for the benefit of the Republic." JA5503; *accord* JA9325, JA9336; JA6692-93.

The district court nevertheless weighed this factor in favor of alter-ego status based solely on the government's status as PDVSA's only shareholder. But that normal incident of ownership cannot possibly count as evidence that the government dominates PDVSA. *See* pp. 23-24, *supra*. Indeed, because governments routinely are sole or majority shareholders of their enterprises, the "profits" *Bancec* factor must require something more than ordinary receipt of profits. Rather, the government must take the enterprise's profits in a manner that disregards corporate formalities or otherwise suggests complete domination. *Arch Trading*, 839 F.3d at 204; *Seijas*, 502 F. App'x at 22 (commingling assets and forcing instrumentality to bypass its right to profits on transactions). For example, in *Crystallex II*, this Court relied on the "extraordinary taxes" the Maduro regime levied on PDVSA, which were set "at an artificial rate designed to collect more of PDVSA's revenues." 932 F.3d at 148. The district court did not cite a single instance of anything similar here.

### 3. The degree to which government officials manage the entity or otherwise have a hand in its daily affairs

The National Assembly put a stop to the day-to-day domination that the Maduro regime had exercised over PDVSA by enacting the April 9, 2019 "Accord to Expand the Powers Vested and the Number of Ad-Hoc Board Members of PDSA," JA8193-97, which "suspend[ed] any functions given to the Minister of

Hydrocarbons and any other government official, branch, or agency related to PDVSA," JA9335; *accord* JA8196.  The National Assembly further guaranteed PDVSA's independence by enacting the Democracy Transition Statute, *see* pp. 27-28, *supra*, and Guaidó directed in Presidential Decree No. 3 that the Ad Hoc Board may not "follow[] political or partisan guidelines" and must "exercise the powers conferred" on it "autonomously and independently," JA5503.

Ignoring all this, the district court instead pointed to legally irrelevant considerations such as the government's appointment of Ad Hoc Board members and coordination of legal strategy and policy, *see* JA46, JA49; *contra* pp. 24-25, *supra*, and misconstrued the relevant statutes.  For instance, the court interpreted the National Assembly's April 9, 2019 Accord as permitting Guaidó to "suspend[]" the *Ad Hoc Board's* authorities, JA48—but it is undisputed that the Accord empowered the Ad Hoc Board and suspended the authority of the *Maduro-appointed* board.  *See* JA8195-96 (Arts. 2, 6); *accord* JA9335 ¶ 39.  Similarly erroneous is the court's characterization of the Accord as establishing "'total control' of PDVSA by the Guaidó Government."  JA48.  That characterization is contradicted by the Accord's plain text, which conferred on Guaidó authority to *expand* the Ad Hoc Board's powers and directed that the *Board* would manage PDVSA.  JA8194-95 (Arts. 1-2).  Moreover, although the court fastened upon the phrase "total control," that phrase was used by the former Chair of the Ad Hoc Board to mean something entirely

different: he stated that "once the boards of directors [i.e., the boards of PDVH, CITGO Holding, Inc., and CITGO Petroleum Corporation] assumed total control and therefore, the management of the companies, progress was made . . . in their recovery." JA6690 ¶ 8; *see* JA450.

The court also erred in asserting that the Democracy Transition Statute empowers the National Assembly to approve PDVSA's contracts with foreign parties, JA47-49. In fact, the Democracy Transition Statute says nothing of the sort, and although the Venezuelan constitution permits the National Assembly to review national-interest contracts, that provision predates 2003, when the relationship between PDVSA and Venezuela became one of alter ego under Chávez and then Maduro. JA8348-49; *see generally* JA5783-92. As the district court itself recognized, "[u]ntil approximately 2003, PDVSA operated as an independent economically-driven company, without political interference from Venezuela." JA31. Under the district court's own reasoning, then, the National Assembly's approval of certain contracts is fully consistent with PDVSA's independence. In any event, a government's reservation of authority to approve particularly important policy initiatives does not suggest that it exercises the necessary *day-to-day* control over the enterprise. *Flatow*, 308 F.3d at 1073; *Doe v. Holy See*, 557 F.3d 1066, 1079 (9th Cir. 2009) (government's provision of "final approval" to certain important decisions did not constitute day-to-day control); *see* p. 24, *supra*.

Once again, PDVSA's independence under the Interim Government is the polar opposite of the daily control exercised by the Maduro regime that this Court considered in *Crystallex II*. As this Court noted, Maduro appointed not only PDVSA's directors, but its "president, . . . vice-presidents, and members of its shareholder council"—and the appointee to the office of Executive Vice-President was a Vice Admiral of the Venezuelan military. *Crystallex II*, 932 F.3d at 148 (citation omitted). Under Maduro, PDVSA's president, a Major General, served as Venezuela's oil minister, allowing the government "to control the daily operations of PDVSA." *Id.* (citation omitted). Maduro also exercised political control over PDVSA: employees who opposed the regime were threatened with termination. *Id.* The Court also noted that Chávez fired 40% of PDVSA's workforce after they went on strike to protest the regime. *Id.* Nothing of the sort occurred under the Interim Government. No Interim Government officials serve on the Ad Hoc Board or any of the subsidiaries' boards. JA6691 ¶ 11(e)-(f). No one in the Interim Government has ever fired any PDVSA employee or removed an Ad Hoc Board member. JA6692 ¶ 11(g)-(h).

### 4.    Whether the government is the real beneficiary of the entity's conduct

The Interim Government is not the real beneficiary of PDVSA's conduct in any way that suggests an alter-ego relationship. Because, as *Bancec* recognized, government enterprises are created to further governmental functions, 462 U.S. at

625-26, an entity's acting to further the national interest cannot in itself establish that the government is the real beneficiary of the entity's conduct for purposes of alter-ego status. *Seijas*, 502 F. App'x at 22 (bank's loan in furtherance of government's financial interests did not suggest alter-ego status because loans complied with corporate charter). Rather, the relevant question is whether the entity furthers the government's interests at the expense of its own. *Id*. at 22-23.

As explained above, the Democracy Transition Statute and Presidential Degree No. 3 prohibit PDVSA from using its assets for the sole benefit of Venezuela. Transactions between PDVSA and the Interim Government have followed all corporate formalities and furthered PDVSA's own interests as well as those of the government. Appellees have proffered no evidence of PDVSA acting on behalf of the government at its own expense.

In nonetheless concluding that the Interim Government is the true beneficiary of PDVSA's conduct, the district court relied on a smattering of public statements, including PDVSA's description of CITGO as the "crown jewel" and a "strategically important . . . asset of national public interest," and tweets stating that the Ad Hoc Board seeks to "safeguard the assets of Venezuela" and serve all Venezuelans. *See* JA50-52 ¶¶ 113-118. But those statements simply reflect "the reality that the Interim Government represents the Republic as PDVSA's sole shareholder, that PDVSA ultimately operates for the benefit of the Venezuelan people, just as any state-owned

business does." JA6692-93 ¶ 14. Those statements are therefore legally insufficient to establish that the Interim Government is the real beneficiary of PDVSA's conduct in any way that suggests that the government dominates PDVSA.[5]

Again, the contrast to *Crystallex II* is instructive. Maduro abused PDVSA to supply "cheap oil to Venezuela's strategic allies," extracting value from PDVSA without paying for it. *Crystallex II*, 932 F.3d at 148. And when debts for discounted oil were repaid, "the money [was] given to Venezuela, not PDVSA." *Id.* at 148-49 (citation omitted). *Crystallex II* also cited Maduro's transfer to PDVSA of the expropriated mining rights at issue, for no consideration, and PDVSA's "seamless" payment of Venezuela's administrative fees in the Crystallex arbitration. *Id.* at 149. Nothing of the kind occurred under the Interim Government.

5. **Whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations**

Finally, acknowledging PDVSA's independence would not permit the Republic to benefit in U.S. courts while avoiding its obligations. Unlike in *Bancec*— from whose facts this factor derives—the Republic has not attempted to avail itself of affirmative litigation in U.S. courts while simultaneously using the corporate form

---

[5] The district court also asserted that through "PetroCaribe," "Venezuela committed PDVSA to supply oil . . . on favorable economic terms.'" JA52 (citing *Crystallex II*, 932 F.3d at 147; *Crystallex I*, 333 F. Supp. 3d at 413). The Interim Government has never participated in PetroCaribe; that statement pertained to the Maduro regime and is irrelevant.

to avoid liability.  462 U.S. at 630-33.  And unlike in *Crystallex II*, there is no suggestion here that "PDVSA profited directly from [the creditor's] injury."  932 F.3d at 149.  There, because Maduro had transferred the expropriated mining rights to PDVSA, the Court reasoned that equity supported holding PDVSA liable for the Republic's debts arising from that expropriation.  No such circumstance exists here.

The district court held that respecting PDVSA's juridical independence would enable "its alter ego, Venezuela" to benefit in U.S. courts by avoiding collection of its judgment debts, and it emphasized that "any outcome where [a creditor before the Court] is not paid means that Venezuela has avoided its obligations."  JA52 ¶ 121.  But that rationale would produce an alter-ego finding in *every* case in which a creditor seeks to attach the assets of a sovereign instrumentality in order to satisfy a judgment against the state itself—thus rendering meaningless the presumption of juridical independence.

In all events, the alter-ego analysis is equitable, and the equities do not favor attachment here.  Quite the opposite.  The Interim Government ended the Maduro regime's corrupt domination of PDVSA and established a legal framework that would ensure PDVSA's corporate autonomy.  It did so not to avoid its obligations, but as a critical part of its efforts to restore democracy in Venezuela.  The Interim Government agreed that it is obliged to pay its judgment creditors—and made clear its willingness to deal responsibly and equitably with the Government's debt

obligations by committing to a consensual negotiated debt restructuring process. Such a process can take account of the importance of PDVSA and its assets to the Venezuelan people, who face a severe humanitarian crisis as result of the abuses of the Maduro and Chávez regimes.

*    *    *

The district court's holding that PDVSA is Venezuela's alter ego must be reversed.

### E.    The Maduro regime's control of PDVSA in Venezuela is irrelevant

Although the district court correctly ruled that the alter-ego analysis "must focus on the relationship between the Guaidó Government and PDVSA in the United States," JA65, the court also stated that the Maduro regime's control of PDVSA in Venezuela is not "entirely irrelevant," and the court found as an "alternate approach" that the Maduro regime dominates PDVSA in Venezuela, JA71.  The relationship between Maduro and PDVSA in Venezuela is, however, irrelevant and should not be considered.

As the district court correctly recognized, the relevant time period for purposes of the alter-ego analysis is between the filing of the motion seeking a writ of attachment and the issuance of that writ.  Under the FSIA, the "jurisdiction of the Court depends upon the state of things at the time of the action brought," not the time of the conduct giving rise to the suit, and what matters is the *current* status of

40

the property Appellees seek to attach.  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003).  When these judgment-enforcement actions were brought, the United States recognized only the Interim Government as Venezuela's legitimate government, JA5672, and it continues to recognize the National Assembly today. And the United States has at all relevant times declined to recognize "the Maduro regime as the government of Venezuela."  JA6563.  As a result, U.S. courts are required to treat only the Interim Government's actions—not the actions of Maduro and his purported board—as the actions of the government of Venezuela for purposes of the *Bancec* analysis.  *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 19 (2015); *PDVSA US Litig. Tr. v. LukOil Pan Americas LLC*, 65 F.4th 556, 563 (11th Cir. 2023) (Executive's recognition of National Assembly rather than Maduro prohibits U.S. courts from according effect to Maduro regime's actions).

Moreover, these actions seek to attach the property of PDVSA in the United States—property that is controlled by PDVSA's Ad Hoc Board.  It is that entity's alter-ego status, therefore, that is at issue.  There is no dispute that the Ad Hoc Board was created and is regulated by enactments of the Interim Government, and that the Board has no relationship whatsoever with the Maduro regime.  Only the actions of the Interim Government are relevant to the alter-ego analysis.

41

## II.   EVEN ASSUMING THAT PDVSA WERE NOT ENTITLED TO FSIA IMMUNITY, PDVSA'S PROPERTY IS NOT SUBJECT TO ATTACHMENT TO SATISFY THE REPUBLIC'S JUDGMENT DEBTS

### A.   Standard of review

This Court reviews legal issues and issues relating to its own appellate jurisdiction *de novo*. *See Montanez v. Thompson*, 603 F.3d 243, 248 (3d Cir. 2010).

### B.   This Court has pendent appellate jurisdiction to review the district court's ruling that PDVSA's property is subject to attachment

1. In the order under review, the district court held both that PDVSA was not jurisdictionally immune *and* that Appellees were entitled to writs of attachment of PDVSA's property. The court thus rejected Appellants' argument that Rule 69(a) and Delaware law, not federal common law, govern whether to issue such attachments, and that Appellees could not make the requisite showing of fraud under Delaware law. Whether or not that ruling is final for appellate purposes, *see Crystallex IV*, 24 F.4th at 249, it is reviewable under this Court's "pendent appellate jurisdiction," *CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 136 (3d Cir. 2004).

Pendent appellate jurisdiction exists when an otherwise non-appealable order is "inextricably intertwined" with an appealable order, or where "review of the non-appealable order . . . is necessary to ensure meaningful review of the appealable order." *Id.* (citation omitted). Issues are "inextricably intertwined" when "there is sufficient overlap in the facts relevant to both the appealable and non-appealable

issues to warrant plenary review." *Id.* (emphasis and citation omitted); *see, e.g.*, *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 594 (3d Cir. 2004); *Jones v. Brown*, 461 F.3d 353, 358 (3d Cir. 2006). That is plainly true here.

2. As discussed above (*see* pp. 17-42, *supra*), the district court's ruling that PDVSA is subject to FSIA jurisdiction turns on whether, for FSIA purposes, "PDVSA is Venezuela's alter ego"—*i.e.*, whether PDVSA, though presumptively independent, is either (1) "so extensively controlled by" the Republic that PDVSA has no independent immunity from jurisdiction, or (2) a mechanism for the Republic to perpetuate a "fraud or injustice." *Crystallex II*, 932 F.3d at 139-40 (citations omitted). Each prong of that "federal common law" test examines "the relationship between Venezuela and PDVSA." *Id.* at 152; *see* JA28.

The validity of the attachment turns on whether, under Rule 69, Delaware alter-ego law governs the circumstances under which the district court may attach PDVSA's property to satisfy a judgment against the Republic, as Appellants contend, or whether *Bancec*'s federal common-law rule governs, as Appellees contend and the district court held. Although (as will be shown) the test for a valid attachment under Delaware law differs in a dispositive respect from the FSIA jurisdictional test, the two tests overlap significantly. Both the jurisdictional and validity issues turn on the Republic's relationship with PDVSA: Appellees' theory as to both is that the Republic has exercised extensive control over PDVSA. The

validity question therefore arises out of precisely "the same set of facts" as the FSIA jurisdictional issue over which this Court has appellate jurisdiction. *Palcko*, 372 F.3d at 594 (enforceability issues under federal and state law were inextricably intertwined even though legal inquiries were different, because both "ar[o]se from a single arbitration agreement"); *see, e.g.*, *CTF Hotel*, 381 F.3d at 136.

Courts of appeals routinely exercise pendent jurisdiction over challenges to the validity of writs of attachment in circumstances like those here. *See, e.g.*, *Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1381-83, 1387-88 (5th Cir. 1992) (exercising pendent jurisdiction over act-of-state question that was "closely related" to immunity because both hinged on "interrelationship" between sovereign and instrumentality); *Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 589 F. App'x 16, 16-18 (2d Cir. 2014) (similar); *EM*, 800 F.3d at 89 n.46, 97 n.88 ("facts underlying" alter-ego analyses relating to immunity and attachability "overlap significantly").

Moreover, under the district court's (erroneous) approach, the immunity and attachment issues are not merely inextricably intertwined; they are coextensive. The district court applied the *Bancec* federal common-law alter-ego test to the attachment inquiry and concluded that attachment was proper for exactly the same reasons that sovereign immunity was not. JA80; *Crystallex I*, 333 F. Supp. 3d at 396 n.13. Under the district court's view, then, there is plainly "sufficient overlap in the facts relevant

to both the appealable and nonappealable issues to warrant plenary review." *Palcko*, 372 F.3d at 594 (citation omitted).

3.    "[F]actors of reality and practicality" powerfully support exercising "pendent appellate jurisdiction" over the attachment issue. *United States v. Spears*, 859 F.2d 284, 287 (3d Cir. 1988). No sound reason exists to review the immunity ruling now but save the attachment ruling for another day, when both turn on the same facts and similar legal frameworks and the two rulings are each necessary to sustain any authorization of a writ of attachment. *See Palcko*, 372 F.3d at 594. To the contrary, "[a] remand to the district court at this juncture would result in yet another appeal to this [C]ourt raising precisely the same contentions now before" the Court, thereby "encouraging, rather than discouraging, piecemeal appeals." *Spears*, 859 F.2d at 287. Resolving the issue now also could obviate the need for extensive litigation over whether and how Appellees may participate in the anticipated sale process. And immediate resolution would decrease the risk of chaotic stay proceedings at the conclusion of such a sale process, because the legality of *any* order requiring the transfer of PDVSA's assets will depend on the resolution of this issue.

### C.    Under Federal Rule of Civil Procedure 69, PDVSA's property may not be attached to satisfy a judgment against the Republic

Federal Rule of Civil Procedure 69(a) provides that where, as here, "[a] money judgment is enforced by a writ of execution," the "procedure on execution—and in

proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(1). Accordingly, the Rule's plain terms require the court to apply Delaware law to determine the "procedure on execution"—and under Delaware law, attachment is not proper unless PDVSA's corporate structure operates as a vehicle for fraud such that the corporate veil may be pierced. The district court here erred as a matter of law in concluding that *Bancec*'s federal common-law analysis governs the attachment issue and displaces Rule 69(a).

### 1. Appellees have not proved fraud or similar injustice, as Delaware law requires

**a. *Delaware law governs the proceedings to execute on a judgment.*** Under Rule 69(a), "a federal court must follow relevant state law in a proceeding to execute on a judgment, unless a federal statute dictates otherwise." *Schreiber v. Kellogg*, 50 F.3d 264, 267 (3d Cir. 1995).

No federal statute dictates application of any law other than state law. The FSIA is of course a federal statute, but the FSIA does not purport to establish federal standards for a proceeding to execute against a non-immune foreign instrumentality's assets to satisfy a foreign state's judgment debt. To the contrary, in *Republic of Argentina v. NML Capital, Ltd.*, the Supreme Court rejected the argument that the FSIA implicitly alters or overrides Rule 69 simply because "the judgment debtor is a foreign state." 573 U.S. 134, 138-40, 143 n.3 (2014); *see* 28

U.S.C. § 1606 (a foreign state that is not immune should be treated the same way as "a private individual under like circumstances").[6]

Accordingly, state law governs. The "relevant state law" here, *Schreiber*, 50 F.3d at 267, is Delaware law, because Delaware is "the state where the [district] court is located." Fed. R. Civ. P. 69(a).

Under Delaware law, Appellees may execute against the PDVH shares, which are owned by PDVSA, only by piercing PDVSA's corporate veil. That is because the judgments are against the Republic, not against PDVSA itself. *See* 8 Del. C. §§ 324(a), 5031; *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 687 (Del. 1959).

Deciding whether such veil-piercing is appropriate is thus an integral part of the "procedure on execution" and "in proceedings supplementary to and in aid of judgment or execution." Fed. R. Civ. P. 69(a). Whether the veil may be pierced "determines which assets may be reached," which is exactly the issue that Rule 69(a) leaves to state law. *Pac. Reinsurance Mgmt. Corp. v. Fabe*, 929 F.2d 1215, 1219 (7th Cir. 1991); *see United States v. Yazell*, 382 U.S. 341, 355 (1966); *United States*

---

[6] The courts of appeals have applied state law to proceedings to execute against foreign state property. *See, e.g.*, *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 83 (2d Cir. 2002); *Walker Int'l Holdings, Ltd. v. Republic of Congo*, 415 F.3d 413, 416 (5th Cir. 2005); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1130 (9th Cir. 2010).

*v. Miller*, 229 F.2d 839, 841 (3d Cir. 1956).  Accordingly, federal courts applying Rule 69(a) regularly follow state law in determining whether the assets of a party that is not the subject of a judgment may be reached by piercing the corporate veil. *See, e.g.*, *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 737 (7th Cir. 2004) (collecting cases); *Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1148-49 (9th Cir. 2004); *Sys. Div., Inc. v. Teknek Elecs., Ltd.*, 253 F. App'x 31, 34-35 (Fed. Cir. 2007); *Trust v. Kummerfeld*, 153 F. App'x 761, 762 (2d Cir. 2005).[7]

**b.** ***Delaware law requires a showing of fraud or similar injustice, and there has been no such showing in this case.***  Appellees have not met their burden of establishing, under Delaware law, that PDVSA's corporate veil may be pierced.

As this Court has recognized, for veil-piercing to be authorized under Delaware law, there must be a "showing [of] *fraud*—not just extensive control—to seize the property of a non-debtor like PDVSA."  *Crystallex IV*, 24 F.4th at 247-48 (emphasis added).  That type of fraud is not proved merely by showing "that the two companies operate as a single entity."  *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp.

---

[7] Even if—contrary to all those decisions—Rule 69(a) were somehow inapplicable here, Delaware law would *still* apply, because the FSIA provides that, "when a foreign state is not immune from suit," it is treated like a "private party," including as to "the forum State's choice-of-law rule."  *Cassirer v. Thyssen-Bornemisza*, 142 S. Ct. 1502, 1508-09 (2022) (citing 28 U.S.C. § 1606).

3d 602, 614 (D. Del. 2018).  Rather, "Delaware law also 'requires that the corporate structure cause fraud or similar injustice.'"  *Id.* (quoting *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999)); *Buechner*, 154 A.2d at 687 (addressing attachment proceedings involving stock).

The test is a stringent one:  "the corporation" whose veil is sought to be pierced "must be a sham and exist for no other purpose than as a vehicle for fraud." *Wallace*, 752 A.2d at 1184; *see, e.g.*, *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) (plaintiff must establish "that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors").  It is not sufficient simply to allege "fraud or inequity" as part of a substantive claim against a defendant corporation.  *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990).  Allowing veil-piercing based on such an allegation "would render the fraud or injustice element" of the veil-piercing test "meaningless, and would sanction bootstrapping."  *Id.*

Because that fraud requirement is such a high hurdle, piercing the veil under Delaware law is quite "a difficult task."  *Wallace*, 752 A.2d at 1183.  That is by design.  Delaware law has a strong, well-established policy of respecting corporate formalities—one of the strongest in the country.  *See id.*

Appellees have never alleged, or introduced any evidence to prove, that PDVSA is a sham that exists only as a vehicle for fraud or similar injustice.  *See* No.

19-mc-290, Dkt. No. 49, at 6-18, 23-33 (alleging only extensive control, not fraud). Nor could they. Whatever the relationship between the Republic and PDVSA, *see* pp. 17-42, *supra*, PDVSA is not a sham entity, and there is no reason to believe that its corporate structure gives rise to fraud or injustice. *Cf. Crystallex I*, 333 F. Supp. 3d at 403 (district court concluding, in *Bancec* jurisdictional analysis, that "there is not probable cause that giving effect to the separateness of Venezuela and PDVSA would 'work a fraud or injustice'").

### 2.   The district court incorrectly applied federal common law

The district court made a fundamental error about which law governs the attachment question, and so it never addressed the requirements of Delaware law or Appellees' failure to make any showing of fraud or similar injustice that would justify piercing PDVSA's corporate veil. Rather than applying "the procedure of the state where the court is located," Fed. R. Civ. P. 69(a), the district court "applie[d] standards developed pursuant to federal common law" in *Bancec*. JA63. Those common-law standards do not apply here.

**a.   *Rule 69(a) has the force of a statute and therefore trumps federal common law.*** Federal common law does not govern a legal issue unless Congress has been "silent on the issue." *N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 372 (3d Cir. 2015); *see City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304,

313-14 (1981). Thus, "[f]ederal statutes . . . displace federal common law." *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1162 n.8 (3d Cir. 1990).

Under the Rules Enabling Act, Rule 69(a) is binding on the courts—which means that, pursuant to a federal statute, Rule 69(a) itself has the force and effect of a federal statute. *See* 28 U.S.C. § 2072(b); *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988) (holding that a Federal Rule of Criminal Procedure, "in every pertinent respect, [is] as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard the Rule's mandate than they do to disregard constitutional or statutory provisions"); *Bright v. United States*, 603 F.3d 1273, 1279 (Fed. Cir. 2010).

Consequently, federal common law cannot displace Rule 69's express directives. And one of those directives is Rule 69(a)'s mandate that "[t]he procedure on execution . . . must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a); *see City of Milwaukee*, 451 U.S. at 323 & 324 n.18 (federal common law may fill "interstice[s]" left by statutes, but "disagreement" with statutory law "is no basis for the creation of federal common law"); *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 165 (3d Cir. 1993) (declining to "extend the federal common law to discovery motions" when "Rules 5(d) and 26(c) of the Federal Rules of Civil Procedure" govern); *Showan v. Pressdee*, 922 F.3d 1211, 1223 (11th Cir. 2019) (a federal rule "governs" so long as it is

"sufficiently broad to control the issue before the Court," and "federal common law" applies only where "no Federal Rule answers the question in dispute" (citations omitted)); *see also, e.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 100 n.6 (1991) (explaining that issue "is now governed not by a federal common law doctrine of demand but rather by the express terms of Federal Rule of Civil Procedure 23.1"); 28 U.S.C. § 1606.

> **b.** ***Nothing in* Bancec *or in decisions applying* Bancec *says otherwise.***

Nothing in *Bancec* or its progeny displaces the conclusion that Rule 69(a)—and, through operation of that rule, state law—governs proceedings in aid of execution.

In *Bancec*, the Supreme Court did not address attachment or execution—and so Rule 69(a) played no role in the Court's decision. Rather, the Court decided the "substantive law determining the *liability* of a foreign state or instrumentality," which is a federal common-law issue that neither the FSIA nor any other federal statute addresses. *Bancec*, 462 U.S. at 620 (emphasis added). In that case, Bancec, an instrumentality of Cuba, filed suit against Citibank, and Citibank counterclaimed for an offset based on the value of assets that Cuba had expropriated from Citibank. Bancec was subsequently dissolved and its claim transferred to Cuba's Ministry of Foreign Trade. *Id.* at 613-16. "Applying principles of equity," the Court "conclude[d] that Citibank may apply a setoff." *Id.* at 613; *see id.* at 632, 634. In reaching that conclusion, the Court applied "federal common law," as informed by

international law principles, because neither the FSIA nor any other federal statute or rule governed the equitable inquiry. *Id.* at 623; *see id.* at 620; *see also Cassirer v. Thyssen-Bornemisza*, 142 S. Ct. 1502, 1508 (2022).

Federal courts have subsequently applied *Bancec* to the separate question of whether an entity may be considered the "alter ego" of a state for purposes of establishing jurisdiction under the FSIA—again, an issue as to which Rule 69(a) has no relevance. *See, e.g.*, *Crystallex II*, 932 F.3d at 138 ("[A]lthough the *Bancec* doctrine came in a case involving the shifting of substantive liability, it also applied to extend a district court's jurisdiction over a foreign sovereign to reach an extensively controlled instrumentality."); *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 263-64 (5th Cir. 2016); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 446-48 (D.C. Cir. 1990). Like the equitable liability question addressed in *Bancec*, that particular jurisdictional question is governed by federal common law, because no federal statute applies. *See Crystallex II*, 932 F.3d at 145 ("*Bancec* is binding federal common law for disputes *under the [FSIA].*") (emphasis added).

Here, when the district court was asked to apply Delaware law to determine whether attachment of PDVSA's property was a legally valid way for Appellees to execute on their judgments, the question before the court did not concern PDVSA's direct liability for actions taken by the Republic (as in *Bancec*) or whether the court's jurisdiction over the Republic under the FSIA extended to PDVSA as an "alter ego"

(as in the decisions applying *Bancec* discussed above). Rather, the question before the court was only whether, where the Republic has been deemed liable for a judgment and PDVSA has been deemed subject to the court's jurisdiction because it is not immune under the FSIA, a writ of attachment may issue "with respect to [PDVSA's] property" to execute on the judgment. JA62.

Neither *Bancec* nor any decision applying *Bancec* of which Venezuela is aware has treated such a question as one of federal common law, or suggested that federal common law has a role to play in the analysis of the validity of an attachment or other execution-related measure. Nor could they have done so—because applying federal common law to assess the proper procedure on execution and related proceedings contravenes Rule 69(a). *See* pp. 47-48 & n.6, *supra* (collecting cases applying Rule 69(a) to foreign-sovereign attachment issues). It cannot be that the assets of sovereign-owned corporations are more readily subject to attachment than the assets of non-sovereign-owned corporations, as to which state law would indisputably govern. *See* 28 U.S.C. § 1606.

The district court nevertheless believed that a writ of attachment was proper so long as PDVSA is the "alter ego" of Venezuela under the *Bancec* federal common-law test. JA63, JA80. That was legal error. Because Rule 69(a) governs, *Bancec* cannot apply. And because Rule 69(a) directs application of *Delaware* law,

the district court had no authority to set aside the Delaware-law requirement of fraud and apply federal common law instead.

**c.  *This Court has not previously ruled on the issue.*** In choosing to apply federal common law instead of Rule 69(a), the district court stated that this Court "ha[d] previously rejected" the position "that Delaware law applies to this proceeding."  JA80 (citing *Crystallex II*, 932 F.3d at 145).  That is wrong.

This Court's decision in *Crystallex II*, on which the district court relied, was limited to a single issue:  jurisdiction under the FSIA, based on an FSIA immunity determination.  This Court addressed and decided the jurisdictional question of whether "the *Bancec* 'alter[-]ego' doctrine determines . . . jurisdiction to attach PDVSA's assets."  *Crystallex II*, 932 F.3d at 136; *see also id.* ("*Bancec* controls the jurisdictional inquiry here."); *id.* at 38 ("The District Court properly used *Bancec* to extend its jurisdiction to assets held nominally by PDVSA."); *id.* ("[T]he District Court's jurisdiction over Venezuela would extend to PDVSA so long as it is Venezuela's alter ego under *Bancec*.").

This Court certainly acknowledged that the jurisdictional question governed by *Bancec* happened to arise in *Crystallex II* in "the post-judgment enforcement setting"—the same setting in which the jurisdictional issue also arises in this case, *see* pp. 17-42, *supra* (addressing alter-ego jurisdictional analysis under *Bancec*).  But the analysis in *Crystallex II* is limited to whether the district court could "exercise

post-judgment enforcement *jurisdiction*" in that particular setting.  932 F.3d at 138 (emphasis added); *see id.* at 139.

This Court had no occasion in *Crystallex II* to address the law that would apply in the event that jurisdiction were established and execution proceedings were undertaken.  Not surprisingly, then, this Court never decided what source of law governs whether an attachment may issue as to a non-immune party over which the district court has jurisdiction.[8]  The district court's contrary conclusion, which reflects confusion about the relationship between the jurisdictional inquiry and the inquiry into whether attachment is permissible, is insupportable.

## CONCLUSION

The district court's order should be reversed or, at a minimum, vacated and remanded.

---

[8] This Court likewise did not address that question in *Crystallex IV*, the appeal that followed after the remand ordered in *Crystallex II*.  On remand, PDVSA argued that Rule 69(a) required the district court to determine "whether Venezuela has an attachable interest in [PDVSA's] shares of PDVH under Delaware law." *Crystallex III*, 2021 WL 129803, at *8.  The district court refused to undertake that analysis on the ground that PDVSA's argument came too late and that "the validity of the writ has been actually, necessarily, and finally resolved." *Id.* at *10; *see id.* at *9. PDVSA appealed, but this Court dismissed for lack of appellate jurisdiction without reaching the attachability issue. *See Crystallex IV*, 24 F.4th at 249, 258.

Dated:  May 17, 2023        Respectfully submitted,

                        */s/ Donald B. Verrilli, Jr.*
                        Donald B. Verrilli, Jr.
                        Elaine J. Goldenberg
                        Ginger D. Anders
                        Sarah E. Weiner
                        MUNGER, TOLLES & OLSON LLP
                        601 Massachusetts Ave. NW
                         Suite 500E
                        Washington, D.C. 20001-5369
                        (202) 220-1100

                        *Counsel for the Bolivarian Republic of Venezuela*

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that at least one attorney whose name appears on this Brief is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Date: May 17, 2023

Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
*Counsel for the Bolivarian Republic of Venezuela*

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,932 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point, Times New Roman.

3.      The electronic copy of the Brief has been scanned for viruses and none were detected.

Date: May 17, 2023                                      Respectfully submitted,

                                                        */s/ Donald B. Verrilli, Jr.*
                                                        Donald B. Verrilli, Jr.
                                                        *Counsel for the Bolivarian Republic*
                                                        *of Venezuela*

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2023, the foregoing document was served on

all parties or their counsel of record through the CM/ECF system.

Dated: May 17, 2023                    */s/ Donald B. Verrilli, Jr.*
                                        Donald B. Verrilli, Jr.
                                        *Counsel for the Bolivarian Republic of*
                                        *Venezuela*

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that the text of the electronic Brief filed through the CM/ECF

system is identical to the text in the paper copies dispatched on May 17, 2023, by

Federal Express Overnight delivery to the Clerk of the Court of the United States

Court of Appeals for the Third Circuit.

Dated: May 17, 2023

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
*Counsel for the Bolivarian Republic of Venezuela*