**Nos. 23-1647, 23-1781**

# In the United States Court of Appeals
## F O R   T H E   T H I R D   C I R C U I T

OI EUROPEAN GROUP B.V.

v.

BOLIVARIAN REPUBLIC OF VENEZUELA

PETRÓLEOS DE VENEZUELA, S.A.,
*Appellant*

On Appeal from the United States District Court for the District of Delaware
Misc. No. 19-290
(Hon. Leonard P. Stark, United States Circuit Judge)

## BRIEF OF APPELLEE

David B. Salmons
James D. Nelson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC  20004
(202) 739-3000

Jonathan M. Albano
Christopher L. Carter
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA  02110-1726
(617) 951-8063

Edward H. Davis, Jr.
Fernando J. Menendez
SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
(305) 372-8282

*Counsel for Appellee*
*OI European Group B.V.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit Local Appellate Rule 26.1, OI European Group B.V. makes the following disclosure:

(1)    For nongovernmental corporate parties, please list all parent corporations:

*OI European Group B.V. is an indirect wholly-owned subsidiary of O-I Glass, Inc. OI European Group B.V. is a wholly-owned subsidiary of O-I Global Holdings C.V., which is a majority-owned subsidiary of OI International Holdings Inc., which is a wholly-owned subsidiary of Owens-Illinois Group, Inc., which is a wholly-owned subsidiary of O-I Glass, Inc. O-I Glass, Inc. is a publicly-traded company.*

(2)    For nongovernmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock:

*None.*

(3)    If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

*None.*

4)    In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: (1) the debtor, if not identified in the case caption; (2) the

members of the creditors' committee or the top 20 unsecured creditors; and, (3) any entity not named in the caption which is an active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

>    *Not applicable.*

Dated:  May 24, 2023            *s/ David B. Salmons*
                                David B. Salmons

                                *Counsel for Appellee*
                                *OI European Group B.V.*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................i

TABLE OF CITATIONS ..................................................................v

INTRODUCTION ..........................................................................1

STATEMENT OF ISSUES ...............................................................4

STATEMENT OF THE CASE ...........................................................5

    I.    Procedural History.............................................................5

    II.   Background Relevant to Alter-Ego Analysis......................7

        A.   Venezuela..................................................................7

        B.   PDVSA.......................................................................9

        C.   Venezuelan Extensive Control of PDVSA Through and Including August 2018....................................10

        D.   Events Following the District Court's 2018 Ruling ...............11

    III.  District of Delaware Decision ..........................................19

SUMMARY OF ARGUMENT ..........................................................21

STANDARD OF REVIEW ...............................................................23

ARGUMENT ................................................................................24

    I.    PDVSA Is Venezuela's Alter Ego, So It Is Not Entitled to Sovereign Immunity Under the FSIA. ...............................24

        A.   No Party Disputes That, As a Matter of Fact, PDVSA Is Currently Dominated by the Venezuelan State in Venezuela and Abroad..........................................25

        B.   U.S. Recognition of the Interim Government Does Not Change the Alter-Ego Relationship. ........................31

            1.   The United States' recognition of the Guaidó government does not require ignoring Venezuela's actual control over PDVSA abroad. ..............................32

            2.   The Court's alter-ego determination must focus on PDVSA and Venezuela as a whole—not only where the assets OIEG seeks are located. ....................35

# TABLE OF CONTENTS
### (continued)

**Page**

C.     The Actions of the Interim Government—Even When Considered Alone—Support an Alter-Ego Finding. ...............37

D.     In The Alternative, The Court Should Affirm the Alter-Ego Finding Because the Pertinent Time Is the Date of Injury. ....................................................................................45

II.    As Venezuela's Alter Ego Under Federal Law, PDVSA's Property Is Subject to Attachment to Satisfy Venezuela's Judgment Debts. .................................................................49

CONCLUSION ...........................................................................55

COMBINED CERTIFICATES OF COMPLIANCE ...........................................57

CERTIFICATE OF SERVICE .............................................................58

# TABLE OF CITATIONS

**Page(s)**

## CASES

*Banco Nacional de Cuba v. Sabbatino,*
376 U.S. 398 (1964).................................................................54

*Bank of China v. Wells Fargo Bank & Union Tr. Co.,*
92 F. Supp. 920 (N.D. Cal. 1950)...........................................35

*Banque de France v. Equitable Tr. Co.,*
33 F.2d 202 (S.D.N.Y. 1929)..................................................33

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan,*
447 F.3d 411 (5th Cir. 2006) .............................................26, 27

*Cassier v. Thyssen-Bornemisza,*
142 S. Ct. 1502 (2022)............................................................53

*CM Corp. v. Oberer Dev. Co.,*
631 F.2d 536 (7th Cir. 1980) ..................................................47

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*
24 F.4th 242 (3d Cir. 2022) ....................................................51

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*
333 F. Supp. 3d 380 (D. Del. 2018)..................................*passim*

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*
932 F.3d 126 (3d Cir. 2019) .............................................*passim*

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*
2018 WL 4026738 (D. Del. Aug. 23, 2018)......................1, 11, 36

*Dole Food Co. v. Patrickson,*
538 U.S. 468 (2003).................................................................48

*EM Ltd. v. Banco Cent. De La Republica Argentina,*
800 F.3d 78 (2d Cir. 2015) .............................................27, 39, 40

# TABLE OF CITATIONS
## (continued)

**Page(s)**

*EM Ltd. v. Republic of Argentina*,
   473 F.3d 463 (2d Cir. 2007) ...................................................................54

*Energy Marine Servs., Inc. v. DB Mobility Logistics AG*,
   2016 WL 284432 (D. Del. 2016)..........................................................46

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
   462 U.S. 611 (1983)....................................................................*passim*

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
   905 F.2d 438 (D.C. Cir. 1990)..............................................................52

*Gater Assets Ltd. v. AO Moldovagaz*,
   2 F.4th 42 (2d Cir. 2021) .....................................................................42

*Groden v. N&D Transp. Co.*,
   866 F.3d 22 (1st Cir. 2017)...................................................................46

*Guar. Tr. Co. of N.Y. v. United States*,
   304 U.S. 126 (1938)..............................................................................33

*Hendricks & Lewis PLLC v. Clinton*,
   766 F.3d 991 (9th Cir. 2014) ...............................................................53

*Hines v. Davidowitz*,
   312 U.S. 52 (1941)................................................................................55

*J.M. Thompson Co. v. Doral Mfg. Co.*,
   324 S.E.2d 909 (N.C. 1985)..................................................................47

*Jarvey v. Libyan Inv. Auth.*,
   840 F.3d 248 (5th Cir. 2016) ...............................................................52

*Jiménez v. Palacios*,
   250 A.3d 814 (Del. Ch. 2019) ......................................................8, 9, 12

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
   313 F.3d 70 (2d Cir. 2002) ...................................................................54

# TABLE OF CITATIONS
### (continued)

**Page(s)**

*Katzir's Floor & Home Design, Inc. v. M-MLS.com*,
394 F.3d 1143 (9th Cir. 2004) ............................................................54

*Kensington Int'l Ltd. v. Republic of Congo*,
2007 WL 1032269 (S.D.N.Y. 2007)....................................................27

*Latvian State Cargo & Passenger S.S. Line v. McGrath*,
188 F.2d 1000 (D.C. Cir. 1951)...........................................................34

*The Maret*, 145 F.2d 431 (3d Cir. 1944)....................................................34

*Moran v. Johns-Manville Sales Corp.*,
691 F.2d 811 (6th Cir. 1982) ...............................................................47

*Nat'l Union Fire Ins. Co. v. Republic of China*,
254 F.2d 177 (4th Cir. 1958) ...............................................................34

*OI European Grp. B.V. v. Bolivarian Republic of Venezuela*,
2019 WL 2185040 (D.D.C. 2019) ....................................................5, 6

*Pac. Reinsurance Mgmt. Corp. v. Fabe*,
929 F.2d 1215 (7th Cir. 1991) .............................................................53

*Peterson v. Islamic Republic of Iran*,
627 F.3d 1117 (9th Cir. 2010) .............................................................53

*Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
2020 WL 6135761 (S.D.N.Y. 2020).............................................13, 42

*Republic of Argentina v. NML Capital, Ltd.*,
573 U.S. 134 (2014)..............................................................................53

*Republic of Iraq v. ABB AG*,
768 F.3d 145 (2d Cir. 2014) ..............................................25, 32, 33

*Republic of Iraq v. ABB AG*,
920 F. Supp. 2d 517 (S.D.N.Y. 2013) .................................................33

# TABLE OF CITATIONS
(continued)

**Page(s)**

*Republic of Panama v. Air Panama Internacional, S.A.*,
745 F. Supp. 669 (S.D. Fla. 1988) ....................................................34

*Rubin v. Islamic Republic of Iran*,
138 S. Ct. 816 (2018) ...............................................................*passim*

*Salminoff & Co. v. Standard Oil Co.*,
262 N.Y. 220 (1933) ..........................................................................33

*Sys. Div., Inc. v. Teknek Elecs., Ltd.*,
253 F. App'x 31 (Fed. Cir. 2007) ....................................................54

*Tr. v. Kummerfeld*,
153 F. App'x 761 (2d Cir. 2005) ......................................................54

*TransAmerica Leasing, Inc. v. La Republica de Venez.*,
200 F.3d 843 (D.C. Cir. 2000) .........................................................39

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
903 F.3d 333 (3d Cir. 2018) .............................................................40

*Trs. of Nat'l Elevator Indus. Pension v. Lutyk*,
140 F. Supp. 2d 447 (E.D. Pa. 2001) ...............................................47

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
199 F.3d 94 (2d Cir. 1999) ...............................................................27

*Underhill v. Hernandez*,
65 F. 577 (2d Cir. 1895) ...................................................................33

*United States ex rel. Doe v. Heart Sol., PC*,
923 F.3d 308 (3d Cir. 2019) .............................................................46

*United States v. Belmont*,
301 U.S. 324 (1937) ..........................................................................34

*United States v. Pink*,
315 U.S. 203 (1942) ..........................................................................34

# TABLE OF CITATIONS
(continued)

**Page(s)**

*Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*,
475 F. Supp. 2d 275 (S.D.N.Y. 2006) ................................................27

*Walker Int'l Holdings, Ltd. v. Republic of Congo*,
415 F.3d 413 (5th Cir. 2005) ................................................53

*Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*,
965 F.2d 1375 (5th Cir. 1992) ................................................34

*Weininger v. Castro*,
462 F. Supp. 2d 457 (S.D.N.Y. 2006) ................................................51

*Weinstein v. Islamic Republic of Iran*,
831 F.3d 470 (D.C. Cir. 2016) ................................................51

*Wilmington Tr. Co. v. Barron*,
470 A.2d 257 (Del. 1983) ................................................49

*Zivotofsky v. Sec'y of State*,
725 F.3d 197 (D.C. Cir. 2013) ................................................32

## STATUTES

8 Del. C. § 324 ................................................49

10 Del. C. § 5031 ................................................49

28 U.S.C.
§ 1606................................................54
§ 1610................................................7
§ 1961................................................6
§ 1963................................................7

## RULES

Fed. R. Civ. P. 69 ................................................*passim*

**TABLE OF CITATIONS**
(continued)

**Page(s)**

**OTHER AUTHORITIES**

*Organization Chart*, PDVSA, https://perma.cc/V27Z-WTHL ...............................9

Restatement (Third) of Foreign Relations Law § 201 (1987) ................................32

# INTRODUCTION

Plaintiff-Appellee OI European Group B.V. ("OIEG"), is a judgment creditor of the Bolivarian Republic of Venezuela, which indisputably owes Appellees hundreds of millions of dollars. After Venezuela failed to satisfy the judgment obtained against it, OIEG registered the judgment in the District of Delaware, seeking a writ of attachment against state oil company Petróleos de Venezuela S.A. ("PDVSA")'s shares in its wholly-owned Delaware corporation PDV Holding, Inc. ("PDVH"). Such attachment is permissible under the Foreign Sovereign Immunities Act ("FSIA") because PDVSA is the alter ego of Venezuela.

The district court (the Honorable Leonard P. Stark) already held that PDVSA was Venezuela's alter ego in 2018 in a similar case by another Venezuela creditor, *see Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 386 (D. Del. 2018) ("*Crystallex I*"), and ordered the issuance and service of a writ of attachment on the PDVH shares at issue here, *see Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2018 WL 4026738 (D. Del. Aug. 23, 2018), and this Court already affirmed those decisions, 932 F.3d 126 (3d Cir. 2019) ("*Crystallex II*"). Posed with the same question in this case, the district court found, based on an extensive evidentiary record, that Venezuela has continued to exercise extensive control over PDVSA in the ensuing years and that PDVSA is still an alter ego of Venezuela, notwithstanding the U.S.-recognized change in government.

1

Both Venezuela and PDVSA appeal this order, and their appeal should be resolved in the same manner as *Crystallex II*. Appellants paint a rosy picture about "profound changes" since that case, including supposedly "sweeping action to restore PDVSA's legal and practical independence." Venezuela.Br.17-18. But that picture ignores the district court's specific factual findings, which are subject to clear error review. Although the United States in 2019 officially recognized the Interim Government (and Juan Guaidó) as the government of Venezuela, all agree that Nicolás Maduro still controls the state of Venezuela, which dominates PDVSA's assets and operations in Venezuela and abroad. And while Guaidó and his government-in-exile appointed an "Ad Hoc Board" to run PDVSA's operations in the United States, the Ad Hoc Board has *not* "restore[d] PDVSA's legal and practical independence." Venezuela.Br.17.

To the contrary, as the district court repeatedly found, the Ad Hoc Board has itself disregarded PDVSA's independence and exercised extensive control over PDVSA's U.S. operations. Moreover, Maduro concededly still dominates PDVSA in Venezuela and elsewhere—in the same way that led to this Court's prior finding in *Crystallex II* that PDVSA is Venezuela's alter ego. *See, e.g.*, Venezuela.Br.7 n.1 (conceding Maduro's continued control). The fact that PDVSA now has two separate governments of Venezuela trying to gain control over it hardly supports the conclusion that PDVSA is a separate, independently functioning corporate entity.

Appellants hope this Court will ignore the overwhelming evidence of Venezuelan control over PDVSA around the world, but the Court should not do so. The alter-ego test under the FSIA requires looking at the totality of the circumstances regarding the sovereign's relationship with the state-owned instrumentality. The district court found, based on the evidence presented, that the Venezuelan state dominates PDVSA and the vast majority of its operations and assets in Venezuela and worldwide. This Court should not ignore that evidence.

Appellants claim "all state-owned enterprises will be subject to alter-ego liability as a matter of course" if the Court affirms in this case. PDVSA.Br.24; *see* Venezuela.Br.18 (claiming affirming would "strip innumerable state-created instrumentalities of their immunity"). But those exaggerations ignore the district court's thorough factual findings regarding both Venezuelan control abroad and the Interim Government treating PDVSA's U.S.-assets as assets of *the state* and controlling PDVSA's U.S. business activities.

In discussing the Interim Government, Appellants also cherry-pick some evidence, claiming it is not enough (standing alone) to prove PDVSA is an alter ego. But that ignores the holistic, totality-of-the-circumstances analysis required under applicable law, and evidence that is purportedly insufficient standing alone is still *relevant*. The collective evidence identified by the district court plainly supports alter-ego status. Moreover, given the clear facts in this case, Venezuela and PDVSA

resort to arguing that some facts simply are not relevant even though *this Court* unequivocally held the same facts were relevant—and supported alter-ego status—in *Crystallex II*.

This Court should affirm the alter-ego finding.  Moreover, that federal-law finding of alter-ego status entitles OIEG to a writ of attachment to the PDVH shares wholly owned by Venezuela's alter ego, PDVSA.  Venezuela's and PDVSA's arguments against attachment based on Federal Rule of Civil Procedure 69(a) and Delaware law fundamentally misunderstand the role of federal and international law in this uniquely sensitive area.  Among other things, those arguments conflict with clear direction from the Supreme Court's decision in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"), and this Court's decision in *Crystallex II*.

## STATEMENT OF ISSUES

I.    Whether this Court should affirm the district court's finding that PDVSA is the alter ego of Venezuela under the applicable *Bancec* and *Rubin* factors.

II.    Whether a finding that PDVSA is Venezuela's alter ego under *Bancec* and *Rubin* is sufficient to issue a writ of attachment on PDVSA's property as this Court held in *Crystallex II*, or whether a conceded alter ego of a foreign sovereign may escape attachment under a conflicting, state-law, non-FSIA test for corporate veil-piercing.

## STATEMENT OF THE CASE

### I.    Procedural History

***OIEG.***   Judgment creditor OIEG is a Netherlands-incorporated company and an indirect, wholly-owned subsidiary of O-I Glass, Inc., a Delaware corporation headquartered in Perrysburg, Ohio.   OIEG is the majority shareholder in two companies that each owned and operated valuable glass container factories in Venezuela.

OIEG is similarly situated to the Canadian concern Crystallex International Corp.   Each judgment creditor suffered an unlawful expropriation of its valuable commercial property in Venezuela under the Chávez regime.   PDVSA was an alter ego of the Venezuelan state at the time of each expropriation, remained so in 2018 when this Court ruled in *Crystallex II*, and has remained so ever since.

***The OIEG Arbitration.***   After Venezuela, under the regime of Hugo Chávez, expropriated the two factories in 2010, OIEG commenced arbitration proceedings against Venezuela with the International Centre for Settlement of Investment Disputes ("ICSID") on September 7, 2011.   *OI European Group B.V. v. Bolivarian Republic of Venezuela*, 2019 WL 2185040, at *2 (D.D.C. 2019).   The ICSID tribunal issued an award on March 10, 2015, finding, *inter alia*, that Venezuela expropriated OIEG's interests and was required to pay to OIEG $372,461,982 in damages for the expropriation, and $5,750,000 in costs and expenses, plus interest.   *Id*.   While the

OIEG Award became "binding on the parties" under Article 53 of the ICSID Convention, *id.*, Venezuela delayed enforcement with a meritless "annulment" application. The ICSID annulment panel moved less swiftly than did Crystallex's, but finally denied the application on December 6, 2018, reaffirmed the OIEG Award, and awarded additional damages. *OI European Group B.V.*, 2019 WL 2185040, at *2-3.

**The OIEG Judgment.** On May 21, 2019, the DC Court granted OIEG's motion for summary judgment, confirmed the OIEG Award and entered judgment in favor of OIEG, consisting of:

- $372,461,982 in principal amount, plus interest from October 26, 2010 through May 21, 2019; *plus*

- $5,750,000 in costs and expenses granted in the original arbitration proceeding, plus interest from March 10, 2015 through May 21, 2019; *plus*

- $3,864,811.05 in costs and expenses relating to the annulment proceeding, plus interest from December 6, 2018 through May 21, 2019; *plus*

- Post-judgment interest on the total amount ($583,500,067.44), calculated at the rate set forth in 28 U.S.C. § 1961, from May 21, 2019 until full payment.

JA629; JA5591-92.

*Authorization of Enforcement and Registration of Judgment.* On November 1, 2019, the DC Court authorized OIEG to pursue enforcement remedies against Venezuela pursuant to 28 U.S.C. §§ 1963 and 1610(c). JA5596-5603. OIEG registered the Judgment with the Delaware District Court pursuant to 28 U.S.C. § 1963 on November 4, 2019, JA188-91, and also moved for a writ of attachment *fieri facias* against the shares of PDVH held by Venezuela's alter ego PDVSA on the basis that Venezuela was collaterally estopped from contradicting the district court's August 2018 decision that PDVSA is Venezuela's alter ego. JA224. The District Court denied OIEG's motion, ruling that OIEG was required to show, by a preponderance of the evidence, that PDVSA remained the alter ego of Venezuela. JA5538-42. On March 23, 2023, the District Court granted OIEG's amended motion for issuance of a writ of attachment, after finding that PDVSA was Venezuela's alter ego.

## II.    Background Relevant to Alter-Ego Analysis

This background is drawn from facts that are part of the record before, and formed the basis of the decision of, the district court. *See* JA26-62.

### A.    Venezuela

Venezuela is a sovereign state and judgment debtor of OIEG. The *state* is to be distinguished from its *government*—both the legitimate or *de jure* government

(whose status depends on political acts and points of view of diplomacy) and its actual or *de facto* government: the regime having actual control over the state.

In 2013, following the death of former President Hugo Chávez, Maduro became Venezuela's president. *Jiménez v. Palacios*, 250 A.3d 814, 821 (Del. Ch. 2019), *aff'd*, 237 A.3d 68 (Del. 2020). In May 2017, when political opponents gained control of Venezuela's legislative body (the National Assembly), the Maduro regime formed a new legislative body, the National Constituent Assembly, granting it the power to legislate and to put opposition leaders on trial. *Id*. at 821.

In August 2018, when the district court ruled in *Crystallex I*, Maduro was both *de jure* and *de facto* President of Venezuela. On January 10, 2019, he reclaimed the office after a disputed election. JA40 (¶ 65). Venezuela's National Assembly rejected the claim and named the opposition leader, Juan Guaidó, as "Interim President" of Venezuela. *Id*. On January 23, 2019, the then-U.S. President issued a statement "officially recognizing the President of the Venezuelan National Assembly, Juan Guaidó, as the Interim President of Venezuela." JA5672. However, the United States continued to acknowledge that Mr. Maduro's regime was exercising *de facto* power over the state. "We continue to hold the illegitimate Maduro regime directly responsible for any threats it may pose to the safety of the Venezuelan people." *See id.* The then-President recognized Mr. Guaidó as

Venezuela's official representative, authorized in the United States to speak for Venezuela and represent its interests.

## B.    PDVSA

Venezuela is home to the "largest proven oil reserves in the world," *Jiménez*, 250 A.3d at 822, and sovereign control over the state's oil company is constitutionally mandated. "[T]he Venezuelan constitution … endows the State with significant control over PDVSA and the oil industry in the country." *Crystallex II*, 932 F. 3d at 147. PDVSA was formed as the state oil company in 1975, pursuant to Venezuela's Nationalization Law. JA5605-12; JA5614-20; JA5688 (¶ 12). PDVSA was in 2018, and remains today, a state-controlled commercial enterprise directed to "comply with and implement the policy on hydrocarbons enacted by the National Executive Branch." JA5622-38; JA5640-66; JA5689 (¶ 14). "PDVSA's Articles of Incorporation require that it adhere to policies established by the National Executive." *Crystallex I*, 333 F. Supp. 3d at 408.

PDVSA today operates a world-wide petroleum business centered in Caracas, which includes all commercial activities of the petroleum industry in Venezuela.[1]

---

[1] PDVSA's website lists twenty-four direct subsidiaries across the world. Only two, including PDVH, are in the United States. *See* PDVSA, Organization Chart, https://perma.cc/V27Z-WTHL. PDVSA owns 100% of the shares of PDVH, a Delaware corporation, which in turn owns 100% of the shares of CITGO Holding, Inc. CITGO Holding, Inc. owns 100% of the shares of CITGO Petroleum Corp., a Delaware corporation headquartered in Texas. *Jiménez*, 250 A.3d at 822.

Pursuant to its bylaws, "PDVSA plans, coordinates and controls the exploration, exploitation, transportation, manufacturing, refining, storage, commercialization, and other activities of its subsidiaries regarding crude oil and other hydrocarbons both in the territory of the Republic and abroad." JA5719 (¶ 5).

In 2019, Guaidó formed a U.S.-recognized government and subsequently appointed his own board of directors for PDVSA (the "Ad Hoc Board"), which controls PDVSA's limited assets in the United States with the support of the United States government. JA41. The Ad Hoc Board has never acquired control or influence over the global enterprise. Since 2018, PDVSA has also been governed by a Shareholder's Assembly and a board of directors in Venezuela. These Maduro-led bodies have continued to review and approve the annual reports, financial statements, and budgets of PDVSA, dispose of the company's assets and properties, transact with third parties, and appoint the officers who manage its employees across the world, its subsidiaries (in Venezuela and abroad), and its headquarters in Caracas. *See* JA5720 (¶ 11).

### C.    Venezuelan Extensive Control of PDVSA Through and Including August 2018

On August 9, 2018, the district court ruled that PDVSA was an alter ego of Venezuela and that shares of PDVH were subject to attachment by a judgment creditor of Venezuela in *Crystallex I*, a case brought by a creditor similarly situated to OIEG. The court applied the alter-ego analysis set out in <u>*Bancec*</u>. The court's

factual review was close and pervasive—and spanned multiple Venezuelan governments. Among facts found were that:

- Venezuela used PDVSA's property as its own, *Crystallex I*, 333 F. Supp. 3d at 406;

- Venezuela ignored PDVSA's separate status, *id.* at 406-07;

- Venezuela deprived PDVSA of independence from close political control, *id*. at 407-08;

- Venezuela required PDVSA to obtain government approvals for ordinary business decisions, *id.* at 408-09; and

- Venezuela issued policies causing PDVSA to act directly on behalf of Venezuela, *id*. at 409-10.

This Court affirmed the district court's analysis, applying a five-factor *Bancec* test. *Crystallex II*, 932 F.3d at 140-41 (citing *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018)), and also observed, in part, that PDVSA's 2011 and 2016 bond disclosures "leave no doubt Venezuela has the power to intervene and mandate PDVSA's economic policies." *Id.* at 146.

### D.    Events Following the District Court's 2018 Ruling

At all times since August 2018, the Venezuelan state's dominance and control of PDVSA's commercial enterprise has persisted. Every factor that informed the district court's and this Court's decisions in *Crystallex* remain true today. While Appellants insist that Venezuela's new, U.S.-recognized government-in-exile changes everything, the facts as established in the hearing before Judge Stark

demonstrate otherwise.  The district court found the state of Venezuela continues to exercise control over PDVSA.

***The Interim Government.***  On February 5, 2019, the National Assembly approved and adopted a Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela (the "Transition Statute").  *Jiménez*, 250 A.3d at 824.  As the district court recognized, the statute "specifically empowered Guaidó to appoint the Ad Hoc Board 'to exercise PDVSA's rights as a shareholder of PDV Holding.'"  *Id.*; JA46.

The Ad Hoc Board and the Interim Government have not effected a change in the 2018 status quo.  The Interim Government has tried to assert state control over PDVSA in the United States.  To fund itself, the Interim Government draws directly from PDVSA's commercial subsidiaries in the United States, bypassing PDVSA's corporate right to dividends.  JA44; JA5991-99 ("the Trump administration gave the Venezuelan opposition access to U.S. bank accounts containing billions belonging to the state-owned oil company, PDVSA").  In 2017, President Maduro decreed that "Venezuela would restructure the external debt of both Venezuela and PDVSA."  *Crystallex II*, 932 F. 3d at 147-48; JA44.  In July 2019, Mr. Guaidó made a nearly identical promise: "no different treatment shall be accorded to eligible … claims as a result of … the identity of the public sector obligor (the Republic, PDVSA or another public sector entity)."  JA5669.

The district court noted the Ad Hoc Board's website states the following on its "Our Mission" page: "Take back PDVSA abroad assets to … achieve social welfare and progress for all Venezuelans." JA51. The Ad Hoc Board's Twitter feed regularly tweets messages in support of the Guaidó government and refers to PDVSA's assets as assets of Venezuela. *See id.*; JA5961 ("The ad hoc PDVSA Board continues to work actively to recover Venezuela's assets abroad[.]"); JA5964 ("The new CITGO Board of Directors cooperates with North American courts to safeguard the assets of Venezuela and determine responsibility."); JA5966 ("[CITGO's] value and potential is incalculable, we must recover it and put it at the service of Venezuelans."). In late 2019, the Interim Government declared the 2020 PDVSA bonds to be void and illegally issued. *See* JA49; *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 2020 WL 6135761, at *6 (S.D.N.Y. 2020). As the district court found, Venezuela regards debt of the state as debt of PDVSA and vice versa. JA67.

The Interim Government has also continued to assert Venezuela's economic control over both PDVSA and PDVSA's assets. A declaration from the author of the Transition Statute (Mr. Hernandez) illustrates this point. Couched as rules to "restore the autonomy" of PDVSA's U.S. assets, the Transition Statute does the opposite by purporting to implement state mandates directly over PDVSA's assets and subsidiaries. "[T]he business of PDV Holding, Inc. and its subsidiaries shall

13

follow commercial efficiency principles, subject only to the control and accountability processes exercised by the National Assembly, and other applicable control mechanisms."  JA5787 (¶ 12).  Mr. Hernandez notes that "the 'other applicable control mechanisms' include, for example, general rules established in Venezuelan public law applicable to state-owned enterprises," and that the Interim Government (rather than PDVSA itself) "removed" the boards of PDVSA's U.S. subsidiaries and reappointed new boards.  JA5787-91 (¶¶ 12-19).

*The Maduro regime*.  As the district court found, soon after enactment of the Transition Statute, it became clear that the Ad Hoc Board was unable to diminish the Maduro regime's extensive control over PDVSA outside the United States.  JA52-59.  While the Transition Statute led to U.S. recognition of corporate reorganizations at PDVSA's U.S. *subsidiaries* (done at the direction of Mr. Guaidó), these actions have had next-to-no effect on *PDVSA itself*.  The Maduro regime, through its political actors, continues to dominate and control PDVSA despite the Interim Government's recognition.  JA40.  The PDVSA website publishes the names of its board members.  No member of the Ad Hoc Board is listed.  *See* JA5828-30.  Members of the Ad Hoc Board dare not even visit the company or its premises; they are subject to a Venezuelan criminal prosecution launched in 2019 under the auspices of the state's Supreme Tribunal of Justice.  JA5831-39.  As CITGO

Petroleum itself acknowledges, the Maduro regime continues to operate "including through its control of PDVSA in Venezuela." JA5841.

In March 2019, PDVSA, acting entirely through Maduro-regime officers, announced the opening of an office in Moscow. JA54; JA5844. Those Maduro officers then set up a factoring arrangement between PDVSA and Rosneft (a Russian oil company headquartered in Moscow), which would allow PDVSA to avoid U.S. sanctions and to continue selling oil. JA54; JA5847-53. In September 2019, a Maduro-appointed oil minister moved PDVSA's Lisbon office to Moscow to avoid the effect of U.S. and European sanctions. JA54; JA5730-31. A month later, Reuters reported (from Caracas and elsewhere) that "Maduro has retained a firm grip on power in the OPEC nation" and continues to control the day-to-day operations of Venezuela and all Venezuelan operations of PDVSA. JA5736. In November 2019—at about the time that OIEG sought its writ of attachment—PDVSA signed another commercial contract with an Indian concern, with Maduro-regime officers providing the signatures, JA54; JA5870, while Maduro pledged Venezuelan state funds to pay PDVSA's direct contract obligations for the completion of construction of PDVSA tankers. JA58; JA5752-54. In February 2020, CITGO Petroleum released a statement that Mr. Maduro's regime utilized "its control of PDVSA in Venezuela" and Venezuela's military to take possession of CITGO Petroleum's crude oil that was meant for delivery overseas. *See* JA57; JA5851. In May 2020,

acting through its European subsidiary PDVSA Europa, PDVSA sold a significant and valuable stake in Nynas, a Swedish oil refinery.  JA54-55; JA5841.  After the fact, the Ad Hoc Board criticized the sale as "harm to *the nation's wealth* supported by agents of the Maduro regime," and stated that it "*was not informed of* the company's sale of a 35% stake in Swedish refiner Nynas."  JA54-55; JA5945-46 (emphasis added).

On April 27, 2020, Maduro installed Asdrubal Chávez (whom he had previously appointed as president of CITGO Petroleum) as president of PDVSA. JA56; JA5878; JA5887-89.  Maduro also appointed Tarek El Aissami (former close ally of Hugo Chávez) Minister of Petroleum and directed him to restructure PDVSA. JA57; JA5878; JA5899.

On May 31, 2020, Maduro announced on national television that PDVSA would increase consumer prices.  JA55; JA5934-36.  During that same briefing, he specified how PDVSA would sell gasoline and to whom.  *Id.*  A press release published on PDVSA's website advised that the price of gasoline would increase "pursuant to President Maduro's announcement."  JA55; JA5872-73. Consumer prices were increased by PDVSA pursuant to this instruction. To this day, Mr. Maduro makes announcements *in PDVSA's offices* and PDVSA's own press releases issue the Maduro regime's policy.  JA57; JA5892-93.

In July 2020, a close observer of facts on the ground in Venezuela observed: "[t]he campaign to replace President Nicolas Maduro has fizzled. … While Maduro and opposition leader Juan Guaidó both claim to be president, *Maduro maintains control of key assets including* the military, media, police and *state-run oil company Petroleos de Venezuela SA, or PDVSA*." JA5939 (emphases added).

In 2019 and 2020, state ministers continued to use PDVSA property—including its aircraft—for state purposes. *See* JA58; JA5949-50; JA5761-63. OFAC has stated that the "illegitimate Maduro regime has continued to use [PDVSA] as its primary conduit for corruption to exploit and profit from Venezuela's natural resources." JA53; JA5765-68.

Venezuela exercises direct control over distribution of the state's petroleum through PDVSA, both domestically and as a matter of foreign relations to benefit Venezuela. On March 3, 2020, *ABC Spain* reported that Venezuela (via Mr. Maduro) was gifting "PDVSA" petroleum to Cuba, despite Venezuela's own fuel shortage. JA58; JA5985-86. In July 2020, *El Nacional* reported that PDVSA gasoline was being loaded onto Cuban oil tankers docked at a PDVSA refinery, which sources indicated were scheduled to depart for Cuba the next week. JA58; JA5989-90.

In 2018, PDVSA regularly tweeted that "PDVSA is Venezuela," *see Crystallex I*, 333 F. Supp. 3d at 407. It still is. As recently as February 16, 2021,

that message continued with "in PDVSA we think as a Nation" or as a "Country." JA56; JA6023-25.  Since December 11, 2020, PDVSA's official Twitter account has retweeted at least 460 of Mr. Maduro's tweets.  JA59; JA5806 (¶ 4).

***U.S. Sanctions*.**  Throughout this period, U.S. sanctions have remained firmly in place on Venezuela and PDVSA.  This confirms that in the United States' view, the appointment and recognition of the Interim Government has not worked any change in Venezuela itself, nor on its relationship with PDVSA.  *See* JA5770 ("Sanctions are intended to change behavior …. As Venezuela's state-owned oil company, PdVSA has long been a vehicle for corruption.").  Two days after recognizing Mr. Guaidó as the Interim President of Venezuela, the former U.S. President issued Executive Order 13857 to amend the definition of "Government of Venezuela" used in prior sanctions to *include PDVSA explicitly*.  *See* JA5773-74.

In January 2019, OFAC acknowledged that the state's domination of PDVSA was unchanged.  It stated that "[t]he path to sanctions relief for PDVSA and its subsidiaries is through the expeditious *transfer of control of the company* to Interim President Juan Guaidó or a subsequent, democratically elected government." JA5777 (emphasis added).  The statement implicitly acknowledges the obvious: control did not then lie with the Interim President.  Today the sanctions remain in place.

In August 2019, shortly before OIEG sought its writ of attachment, the United States reaffirmed the connection between Venezuela and PDVSA: "the term 'Government of Venezuela' includes … Petróleos de Venezuela, S.A. (PdVSA)." JA5780.  The former U.S. President clarified that the "Government of Venezuela" also includes "any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, *including as a member of the Maduro regime*." *Id*. (emphasis added).  While the Interim Government enjoys diplomatic status in the United States, Venezuela and PDVSA themselves remain as profoundly within the control of the Maduro regime as it had been in 2018.

## III.    District of Delaware Decision

Based on the above-summarized findings of fact, the district court rightly held that the judgment creditors met their burden to show by a preponderance of the evidence that PDVSA was, at all relevant times, the alter ego of Venezuela.  Based on a thorough review of all the evidence and evaluating it under the *Bancec* totality-of-the-circumstances factors, the district found the evidence showed that the Interim Government exercised control over PDVSA's operations in the United States, while the Maduro regime exercised direction and control over its operations in Venezuela and elsewhere.  JA29; JA61.

The district court focused first on the Interim Government's relationship with PDVSA in the United States because it was recognized as the legitimate Venezuelan

government by the United States and because the property subject to attachment is also located in the United States. JA65-68. The district court identified no case law holding that government recognition or location of certain assets should affect the alter-ego analysis regarding Venezuela's relationship to PDVSA in its entirety—and the court went on (rightly) to consider Venezuela's control over PDVSA outside the United States as well. JA71-72.

In any event, the district court held that even focusing *solely* on the Interim Government's control over PDVSA in the United States, PDVSA is Venezuela's alter ego. JA67-68. The court found that the Interim Government exercises control over PDVSA's daily corporate activities through the government-appointed PDVSA Ad Hoc Board; treats PDVSA's assets as its own; has used PDVSA's subsidiaries' U.S. assets to fund itself and the Republic's legal defense; has directed PDVSA to halt its debt repayments; and has announced that PDVSA's debts will be treated the same as the Republic's debts in an ultimate debt restructuring. JA42-52. The court also found that adherence to separate identities "would entitle Venezuela to benefits in U.S. Courts while allowing Venezuela to avoid its obligations." JA68.

The district court went on to apply the *Bancec* factors to evidence regarding the Maduro regime's undisputed control over PDVSA in Venezuela—evidence plainly sufficient for an alter-ego finding. JA55-59; JA71-72. That evidence included many facts that this Court recognized were more than sufficient to establish

alter-ego status in *Crystallex II*:  for example, Maduro appointed members of PDVSA's board of directors; the Maduro regime uses PDVSA property (including airplanes) for state activities; and Maduro continues to use PDSVA's assets for the state's policy purposes by changing prices, giving petroleum to other nations for free, moving PDVSA locations, and requiring PDVSA to revoke gasoline licenses as the state desires.  JA71-72.

## SUMMARY OF ARGUMENT

I.   This Court should affirm the district court's ruling that PDVSA is Venezuela's alter ego, which was based on a thorough examination of all the facts in the record (even those Appellants attempt to ignore and downplay).

A.  As an initial matter, no one disputes that the Venezuelan state, which is largely controlled in fact by the Maduro regime, dominates PDVSA's operations and assets in Venezuela and abroad.  Neither Appellant challenges the district court's findings of Venezuelan control—including Venezuela using PDVSA's assets as its piggybank and dictating PDVSA's gas prices, its sales and gifts of oil in Venezuela and other countries, where PDVSA opens offices, and which military officials run its operations.  Nor do Appellants dispute that if that evidence is considered, PDVSA is an alter ego of Venezuela for all the same reasons this Court held in *Crystallex II*.

B.  Instead, Appellants argue that U.S. recognition of the Interim Government somehow requires courts to blind themselves to Venezuela's domination of PDVSA

abroad.  Not so.  While U.S.-recognition grants the Interim Government the right to bind Venezuela to diplomatic agreements and to enter contracts that would be recognized here, it does not require this Court to ignore obvious facts PDVSA's lack of independence.  For alter-ego analysis, the question is whether, notwithstanding official Ad Hoc Boards or governmental decrees, the actual corporate enterprise PDVSA remains a tool of the Venezuelan state, which it clearly does.

C.  Even if the Court were to consider only evidence of Interim Government control over PDVSA's U.S. operations, the district court found substantial evidence demonstrating extensive control and alter-ego status.  The court found significant evidence showing that the Interim Government treats PDVSA's U.S. assets as its own—using them to fund its legal fees—and dictates to PDVSA's Ad Hoc Board when it must (and may not) pay debts, which bonds are valid, and with whom it may enter contracts.  This sort of control far exceeds mere shareholder status and requires affirmance of the alter-ego finding.

D.  In the alternative, the "pertinent time" for deciding alter-ego status is when OIEG was injured by Venezuela—and this Court already held that, back then, PDVSA was Venezuela's alter ego.  As a matter of equity and alter-ego case law, PDVSA cannot avoid its assets being used to satisfy Venezuela's debt if it was one-and-the-same with Venezuela when OIEG's assets were stolen.  That provides another, independent reason to affirm.

22

II.  Finally, Appellants' last-ditch attempt to avoid any payment to OIEG by resorting to Delaware law must fail, since federal law governs the alter-ego analysis for foreign instrumentalities under the FSIA.   Appellants' contrary argument conflicts with *Bancec*, *Crystallex II*, and the text of Rule 69 itself.

## STANDARD OF REVIEW

This Court reviews findings of fact for clear error and legal questions de novo, and it reviews de novo the "ultimate determination whether to treat PDVSA as Venezuela's alter ego." *Crystallex II*, 932 F.3d at 136.  The burden of proof is a "preponderance of the evidence" standard. *Id.* at 145-46.

Under *Bancec*, the separate identity of a sovereign state and its instrumentality should be disregarded where the state exercises extensive control over the instrumentality. *Id.* at 146-49.  Courts consider five factors as part of a holistic approach to alter-ego status: "(1) the level of economic control by the government, (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in the United States while avoiding its obligations." *Id.* at 141 (*citing Rubin*, 138 S. Ct. at 823).  These factors are not inflexible; they are "meant to aid case-by-case

analysis" of the totality of the circumstances "rather than establish a 'mechanical formula.'" *Id.*

## ARGUMENT

### I. PDVSA Is Venezuela's Alter Ego, So It Is Not Entitled to Sovereign Immunity Under the FSIA.

As demonstrated by the district court's thorough analysis of the facts in this case, PDVSA is the alter ego of Venezuela. The facts on the ground in Venezuela have not materially changed since this Court held PDVSA was Venezuela's alter ego in *Crystallex II*: the Maduro regime still dominates all aspects of PDVSA's operations in Venezuela and around much of the world. Moreover, in the United States, Venezuela continues to exercise significant control over PDVSA through the Interim Government. Looking to all the record facts and applying the totality-of-the-circumstances test applied in *Crystallex II*, the Court should again affirm the finding that PDVSA remains an alter ego of Venezuela.[2]

---

[2] Appellants belabor the "presumption of separateness," PDVSA.Br.20-21; Venezuela.Br.19-22, but that is not helpful to them, as the district court recognized that presumption, JA62-63, and went on to hold the overwhelming evidence showed alter-ego status. Relatedly, PDVSA focuses (at 20-21) on the policy of not lightly holding foreign instrumentalities are alter egos but ignores *Bancec*'s countervailing "core concern—ensuring that foreign states not dodge their obligations under international law." *Crystallex II*, 932 F.3d at 146.

**A.    No Party Disputes That, As a Matter of Fact, PDVSA Is Currently Dominated by the Venezuelan State in Venezuela and Abroad.**

Neither Venezuela nor PDVSA challenge on appeal any of the district court's findings that the Maduro regime continues to exercise extensive control over PDVSA in Venezuela and abroad or its holding that—if those facts are considered—PDVSA plainly is Venezuela's alter ego.  Instead, Appellants insist that the Court should ignore all those undisputed facts because the United States has recognized the Interim Government as the legitimate government of Venezuela.  That conclusion does not follow.

OIEG's claim lies against Venezuela the state, not against any particular government or leader purporting to represent it.  *See Republic of Iraq v. ABB AG*, 768 F.3d 145, 164 (2d Cir. 2014) ("The obligations of a foreign state are unimpaired by a change in that state's government.").  Today, the corporate enterprise PDVSA—based in Caracas and consisting of refineries, drilling machinery, petroleum products, employees, offices, tankers and ownership of shares of various entities across the world—remains as firmly controlled by the state as they ever were.  *See* JA7118 (¶ 9).

This Court has already affirmed the district court's prior holding that, as of August 2018, "PDVSA is the alter ego of Venezuela."  *Crystallex I*, 333 F. Supp. 3d at 406.  And the record contains overwhelming evidence that the Venezuela-PDVSA relationship remains materially unchanged in Venezuela.  *See, e.g.*, JA52-59

25

(¶¶ 122-64). Indeed, all agree that U.S.-recognition of Guaidó has not changed the Maduro regime's *de facto* control over Venezuela, its territory, and PDVSA and its assets and operations in Venezuela. JA53 (¶ 123).

All Appellants can do is ask the Court to turn a blind eye to the undisputed, overwhelming control Venezuela exercises over PDVSA abroad. Their briefs myopically focus only on Guaidó, the Ad Hoc Board he appointed to govern PDVSA's limited operations in the United States, and the Interim Government's aspirational documents asserting PDVSA's independence from Maduro (which everyone agrees have had no effect in practice). And they ignore the vast majority of PDVSA's operations around the world. The fact that two rival Venezuelan governments are now competing for control of PDVSA and its assets only reinforces that PDVSA is controlled by the state and lacks the separateness and independence to be regarded as a distinct corporate entity.

Appellants' strategy, if accepted, would elevate form over substance: the opposite of what the alter-ego doctrine requires. *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) ("In making an alter ego determination, a court is concerned with reality and not form, and with how the corporation operated."); *see also Crystallex II*, 932 F.3d at 146 ("[T]he facts are paramount in determining when control is so extensive that entity separateness fades away as a legal distinction."); *Crystallex I*, 333 F. Supp. 3d at 407-08 (noting Hugo

Chávez's control of PDVSA since 2002; discounting formal Venezuelan decrees and legislation); *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 282 (S.D.N.Y. 2006). In the sovereign context, what matters for alter-ego analysis is the state's *de facto* conduct, not its *de jure* government. *See EM Ltd. v. Banco Cent. De La Republica Argentina*, 800 F.3d 78, 91 (2d Cir. 2015) (referring to actions of the "sovereign nation" and "political actors" rather than only a recognized president). To determine whether a sovereign "controls" an instrumentality, courts disregard the existence of "corporate formalities" and instead focus on "the reality of the corporate relationship" between the state and the instrumentality. *Bridas*, 447 F.3d at 419.

The facts on the ground in Venezuela—ignored entirely by Appellants—conclusively show PDVSA is Venezuela's alter ego under all five *Bancec* factors:

**i. Venezuela Retains Economic Control of PDVSA.** PDVSA remains today, as it was before, created by the Venezuelan Constitution as a tool of the state. The constitutional provisions this Court relied on in *Crystallex II* are the same and compel the same result now. 932 F.3d at 147.[3]

---

[3] PDVSA insists that its legal relationship with Venezuela is typical for "national oil compan[ies] in a petrostate." PDVSA.Br.34. But even if true, that would *support* alter-ego status, as courts have often found that state oil companies in petrostates like Venezuela are alter egos of the state. *See Bridas*, 447 F.3d at 419-20; *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 199 F.3d 94 (2d Cir. 1999); *see Kensington Int'l Ltd. v. Republic of Congo*, 2007 WL 1032269, at *9 (S.D.N.Y. 2007).

Moreover, the Venezuelan state still dictates gasoline prices, JA55 (¶ 138), which stations PDVSA may license, *id.* (¶ 140), what countries to sell (or give) oil to, JA54 (¶ 131), and where to open offices (including Moscow), *id.* (¶ 132).

Venezuela's control of PDVSA is an open and notorious fact. The Ad Hoc Board acknowledges that PDVSA's "Caracas office" remains under the control of the Maduro regime, *id.* (¶ 129); CITGO Petroleum acknowledges the Maduro regime controls "PDVSA in Venezuela," *id.* (¶ 130); and the U.S. government has repeatedly confirmed that for purposes of economic sanctions, the "Government of Venezuela" includes *PDVSA* (a recognized arm of the state) and all current political actors of Venezuela (the Guaidó government *and the Maduro regime*). *Id.* The United States recognizes its diplomatic recognition of Guaidó has not affected actual changes in *Venezuela's* actions with respect to PDVSA abroad. JA53 (¶¶ 124-26).

*ii. PDVSA's Profits Go to Venezuela.* "As PDVSA's lone shareholder, all profit ultimately runs to the Venezuelan government." *Crystallex II*, 932 F. 3d at 148. That fact satisfied this factor in *Crystallex II*, and it has not changed.

Moreover, PDVSA's global corporate revenues and assets—from sales in and to Lisbon, Moscow, and China, to control of service stations in Caracas, to the use of aircraft—continue to prop up the Venezuelan state. JA54-55 (¶¶ 129-36); JA56 (¶ 141); JA58 (¶¶ 153-54). The sole exception to this global rule involves assets in the United States, which are largely frozen here not because PDVSA itself has so

ordered, but because the United States has frozen them. And as to these assets, the Interim Government itself observes no line between corporation and state. Without any tax revenue or any other source of funding, the Interim Government relies on intercepting dividends owed by PDVH to PDVSA, as though the PDVSA subsidiary were a state treasury. *See* JA5992-99.

    ***iii. Venezuelan Officials Manage PDVSA's Daily Affairs.*** Everyone agrees that recognition of Guaidó has not changed operations in Venezuela. His ambassador averred that he "does not have full access to the personnel and documents of the government *and its instrumentalities*. To the contrary, the illegitimate Nicolas Maduro regime has refused to relinquish control of the operation of many organs of the Venezuela government." JA5796 (¶ 5) (emphasis added). Ambassador Vecchio "deplores" current Venezuela policy, JA5800 (¶ 13)—further evidence that Venezuelan policy is not Guaidó policy. He avers only to what the Interim Government "plans to engage in." *Id.*[4]

    Through its sanctions regime, the United States agrees. It has declared that PDVSA's assets and operations remain under the domination and control of

---

[4] Recently, when a pipeline explosion damaged a PDVSA facility in Venezuela, the Ad Hoc Board blamed the incident on the Maduro regime's incompetent "management of assets and facilities that belong to the Republic and the Venezuelan people," admitting that PDVSA is dominated by the Maduro regime that currently controls the state. JA7112-17.

Venezuela. Indeed, the U.S. sanctions against Venezuela and PDVSA are based on the United States' position that "President Maduro remains in power in Venezuela, and in control of PDVSA," JA7073; *see* JA5776-77, and that the Maduro regime and PDVSA remain part of the "Government of Venezuela." *See* JA5779-81.

By its actions, Venezuela agrees too. It continues to appoint military officials to run PDVSA and fire (or arrest) employees at will. JA56-57 (¶¶ 143-46). The state continues to dominate and control substantially all of PDVSA's global operations, its officers and employees, its refineries, its rigs, its service stations, its tankers, its offices, its website and messaging, its aircraft, its commercial contracts, its pricing, its establishment of new offices abroad, and its dispositions of assets. JA55-59 (¶¶ 138-40, 142-62).

*iv. Venezuela is the Real Beneficiary of PDVSA's Conduct.* In *Crystallex II*, this Court noted that Venezuela extracts value from PDVSA without paying the company. This reality has not changed. *See* JA57-58 (¶¶ 152-60). Venezuela uses PDVSA to achieve its social and political objectives, both domestically and abroad.

*v. Adherence to Separate Identities Would Entitle Venezuela to Benefits in the United States While Avoiding its Obligations.* A determination that PDVSA today is no longer an alter ego of Venezuela would entitle Venezuela to use the United States' judicial system to effectively eliminate any recovery for OIEG on its judgment. As this Court stated, "Venezuela owes [plaintiff] from a judgment that

has been affirmed in our courts.  Any outcome where [the U.S. judgment creditor] is not paid means that Venezuela has avoided its obligations."  *Crystallex II*, 932 F.3d at 149.  Just so here.

### B.    U.S. Recognition of the Interim Government Does Not Change the Alter-Ego Relationship.

Venezuela and PDVSA argue that the Maduro regime's undisputed domination of PDVSA outside the United States is irrelevant to the alter-ego analysis for two reasons: that (1) Mr. Guaidó and the National Assembly are the U.S.-recognized Interim Government of Venezuela and (2) the assets OIEG seeks to attach (the PDVH shares owned by PDVSA) are located in the United States and purportedly controlled by the Interim Government.  *See* PDVSA.Br.42-48; Venezuela.Br.41-48.  While the Interim Government's actions alone show alter-ego status, *see infra* Section I.C, neither of these facts changes the alter-ego analysis under governing case law, which focuses on facts surrounding the corporation's relationship to the sovereign.

Indeed, Appellants misunderstand the identities of both the corporate entity and the sovereign relevant to the alter-ego analysis.  They insist that the relevant corporate "entity" is "the *ad hoc* Board."  PDVSA.Br.45; Venezuela.Br.41.  But the Ad Hoc Board is not the relevant entity; PDVSA is.[5]  Appellants also repeatedly

---

[5] A corporation is not its board of directors.  PDVSA is a corporate enterprise with assets around the globe.  The Ad Hoc Board is not PDVSA.  It is a slate of appointees

insist that the relevant sovereign *is* the Interim Government.    PDVSA.Br.26; Venezuela.Br.41.    Wrong again.    The relevant sovereign is Venezuela—which is indisputably controlled by Maduro within the territory of Venezuela, and which concededly controls PDVSA outside the United States.

> **1.    *The United States' recognition of the Guaidó government does not require ignoring Venezuela's actual control over PDVSA abroad.***

When the United States recognized Mr. Guaidó as Interim President, it did not recognize a new or different *Venezuela*.    "Under international law, a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities."    Restatement (Third) of Foreign Relations Law § 201 (1987).    Venezuela's territories, resources, people, borders, assets (including the assets and operations of PDVSA), and other attributes of existence did not change. Nor did its debt obligations.    *See Republic of Iraq*, 768 F.3d at 164.

Recognition simply means that, in the United States, a new spokesman was authorized to "speak[] as the sovereign authority for the territory" for purposes of "establishing diplomatic relations with the United States."    *Zivotofsky v. Secretary of State*, 725 F.3d 197, 205 (D.C. Cir. 2013), *aff'd*, 576 U.S. 1 (2015).    Although the

---

of the U.S.-recognized government, which has no actual control over—and in many events no knowledge of—most of the enterprise's global affairs.

Executive's decision of who may speak as a foreign state's representative "is conclusive on all domestic courts," those same courts "are free to draw for themselves its legal consequences in litigations pending before them." *Guar. Trust Co. of New York v. U.S.*, 304 U.S. 126, 137-38 (1938); *see Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 541 (S.D.N.Y. 2013), *aff'd*, 768 F.3d 145 (2d Cir. 2014) ("[A]ttribution operates independently of diplomatic recognition. 'A state is responsible for the conduct of its effective government, whether or not that government was recognized by other states.' What matters is control.") (citation omitted). Oftentimes, equity demands acknowledging the *actions* of a foreign state and attributing conduct to them—even if undertaken by an illegitimate government. *See Banque de France v. Equitable Trust Co.*, 33 F.2d 202, 206 (S.D.N.Y. 1929) ("the refusal of the political department to recognize a government should not be allowed to affect private rights which may depend upon proving the existing conditions in such state").

Despite PDVSA's argument (at 42-48), U.S.-recognition of a government does not require a court conducting alter-ego analysis to ignore the totality of the circumstances. "A foreign government's actions are attributed to the state regardless of … whether they 'are done by the authority of a de jure or titular, or of a de facto, government.'" *Republic of Iraq*, 768 F.3d at 164 (quoting *Underhill v. Hernandez*, 65 F. 577, 582 (2d Cir. 1895), *aff'd*, 168 U.S. 250 (1897)); *see also Salminoff & Co.*

*v. Standard Oil Co.*, 262 N.Y. 220, 225 (1933) (recognizing effects of Soviet actions, "even though they do not emanate from a lawfully established authority, recognized politically by the government of the United States").[6]

Since 2019, much of the world has acknowledged that the Interim Government has been unable to exert any real control over (or bring any real change to) Venezuela. *See* JA5820-23; JA6009-10. Both the Ad Hoc Board and PDVSA itself recognize the Maduro regime's *de facto* control. *See* JA5828-35; *see Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1382 (5th Cir. 1992) ("[W]e look to the ownership and management structure of the instrumentality … as well as the extent to which the agent holds itself out to be acting on behalf of the government.").

PDVSA argues (at 48) that "the validity of [the Interim Government's] acts cannot be questioned by U.S. courts." But recognizing that the Maduro regime in

---

[6] PDVSA cites (at 43-44) irrelevant cases for the unremarkable premise that in U.S. courts, the sovereign power to enact extraterritorial decrees and transfer *formal* legal title to sovereign assets rests with the recognized government. *See*, *e.g.*, *The Maret*, 145 F.2d 431 (3d Cir. 1944); *United States v. Belmont*, 301 U.S. 324, 330 (1937); *United States v. Pink*, 315 U.S. 203, 234 (1942); *Nat'l Union Fire Ins. Co. v. Republic of China*, 254 F.2d 177 (4th Cir. 1958); *Latvian State Cargo & Passenger S.S. Line v. McGrath*, 188 F.2d 1000, 1003-04 (D.C. Cir. 1951); *Republic of Panama v. Air Panama Internacional, S.A.*, 745 F. Supp. 669, 672 (S.D. Fla. 1988). Those cases are inapposite here because the writ is not based on any issued decree or transfer of title by the Maduro regime or its purported enactment of statutes or formal claims of legal title. What matters here—as in *Bancec* and *Crystallex II*—is how PDVSA operates, and whether it is an alter ego of the actual state of Venezuela.

fact controls PDVSA and all its assets in Venezuela does not "question" the validity of Guaidó's acts. It just looks at the *totality* of the circumstances pertaining to PDVSA with respect to the alter-ego analysis (as required).

In short, recognition does not require that this Court ignore the *de facto* government through which Venezuela acts today. *See Bank of China v. Wells Fargo Bank & Union Trust Co.*, 92 F. Supp. 920, 923 (N.D. Cal. 1950) ("[I]t does not follow that the existence of a non-recognized government must be completely ignored. The courts of the United States have given effect to the acts of a non-recognized, de facto government done within the territory it controls … when it has appeared that the most realistic and just result will thus be achieved[.]"). The state manipulates, dominates, and controls PDVSA's assets and operations no less than it did in the years leading up to this Court's decision in 2019.

> **2.    *The Court's alter-ego determination must focus on PDVSA and Venezuela as a whole—not only where the assets OIEG seeks are located.***

In *Crystallex II*, this Court focused on the "relationship between Venezuela and PDVSA," holding that if that relationship "cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can." 932 F.3d at 152. The focus of the alter-ego inquiry was *not* on PDVSA's shares of PDVH, or PDVSA's U.S. presence under an asset-specific test. *Contrast Crystallex II*, 932 F.3d at 152, *with* PDVSA.Br.42 (arguing that Maduro regime does not control *PDVH shares*).

PDVSA is one corporate entity—and whether it is Venezuela's alter ego depends on its operations as a whole.

OIEG is aware of no authority that permits alter-ego analysis to be conducted on an asset-by-asset basis. Alter ego means "other self." The question is whether one putative "entity" is another self of the judgment debtor. *See, e.g.*, *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 822 (2018) (noting question is whether the "corporate entity is so extensively controlled by [the state]"). Indeed, *Crystallex* involved the same U.S.-based assets ("the PDVH shares"), which were subject to "garnishment proceeding[s]," PDVSA.Br.45, yet the district court and this Court focused their alter-ego analysis on the entity as a whole—including by relying on a host of evidence of control *in Venezuela*, not just in the United States where the PDVH shares are located. *See Crystallex II*, 932 F.3d at 147 (evidence focused on Venezuela: dictating who it sells oil to; manipulating PDVSA's conversion of USD to Venezuelan Bolivars; controlling PDVSA's debt structure; appointing of president, directors, members of shareholder council; firing employees; requiring cheap oil to strategic allies; etc.). The location of the PDVH shares was wholly irrelevant to this Court's analysis. Rightly so.

An asset-specific determination is not only unsupported, but it would lead to absurd results. For instance, a global, multi-billion-dollar enterprise with employees, assets, and refineries would *sometimes* be the alter ego of Venezuela and

*sometimes* not, depending on asset location or diplomatic relations. Nor can Appellants' position be reconciled with the *Bancec* factors themselves.

Importantly, the same United States that recognizes the Interim Government continues to sanction PDVSA *because* it is controlled by the sanctioned state. For all the reasons discussed herein, looking to all the evidence reveals the clear (and largely undisputed) control of Venezuela over PDVSA.

### C. The Actions of the Interim Government—Even When Considered Alone—Support an Alter-Ego Finding.

The district court also rightly found that, even when considering the actions of the Interim Government and its domination of PDVSA's U.S. assets alone, PDVSA remains an alter ego of Venezuela. So, even if Venezuela and PDVSA were right that the Court should blind itself to all other evidence—they are wrong, for all the reasons discussed above—the Court should still affirm the alter-ego finding. For, as the district court found, the Guaidó government's actions on behalf of Venezuela alone demonstrate the presence of every *Bancec* factor and thus support an alter-ego finding. *See* JA42-52; JA66-68.

To argue otherwise, Venezuela and PDVSA cherry-pick some facts and complain that such evidence, standing alone, is "legally insufficient" to prove alter-ego status. Venezuela.Br.26. But Appellants' attempt to isolate *some* pieces of evidence, *id.* at 20-26; PDVSA.Br.24-25, misses that the *Bancec* factors are considered as part of a flexible totality-of-the-circumstances inquiry, and that this

Court should consider all the evidence together.  Properly viewing all the facts together, the Interim Government's actions only confirm PDVSA's alter-ego status.

*i. Venezuela Exercises Economic Control over PDVSA.*  As the district court found, the Interim Government's actions show that Venezuela exercises economic control over PDVSA in the United States.  As an initial matter, the Venezuelan Constitution still "endows the State with significant control over PDVSA and the oil industry," which as this Court held, supports alter-ego status under this factor.  JA42-43 (¶¶ 78-81) (quoting *Crystallex II*, 932 F.3d at 147).  The district court also found the Interim Government has acted under the Transition Statute, which provides the National Assembly "control" over PDVSA, to take funds directly from PDVSA's U.S.-subsidiaries, use PDVSA assets to fund its legal fees and the National Assembly itself, and treat "the liabilities of Venezuela and PDVSA," including their debts, "interchangeably."    JA44 (¶¶ 83-85); JA45 (¶ 86) (Interim Government declared PDVSA "bonds to be void and illegally issued").

The Interim Government's official decrees on behalf of Venezuela go well beyond that of a *shareholder* of PDVSA.  The district court found that the Interim Government, purporting to act on behalf of Venezuela, has directed *PDVSA's U.S. subsidiaries* how to operate and act in complete disregard for rules of corporate separateness.  *See* JA43-44 (¶¶ 82-84); JA50 (¶ 113); JA61 (¶ 169); JA67; *see also* JA449-51; JA5498-5503.  And PDVSA must obtain "prior approval" from the

Venezuelan government to engage in its core activities, including legal strategy, spending its own resources, and contracting with foreign nationals. JA45-47 (¶¶ 87-92, 99-100).

Appellants largely ignore these findings, instead asserting that appointing Ad Hoc Board members, state ownership of PDVSA, and the Constitutional provisions are not enough on their own to shown economic control. Venezuela.Br.20-24. Even if that were true, the district court considered a host of *additional* evidence, and these facts are all *relevant* to the totality of the circumstances. *See, e.g.*, *TransAmerica Leasing, Inc. v. La Republica de Venez.*, 200 F.3d 843, 851 (D.C. Cir. 2000) (Appellants' case holding government's ownership of stock and ability to appoint a board of directors are two relevant factors, though not determinative).

Moreover, Appellants' attempt to undermine certain facts fails:

- They claim Venezuela does not fund itself with PDVSA funds, arguing it has only taken (undocumented) loans from PDVSA. Venezuela.Br.29-30; PDVSA.Br.35. But the district court was well within its rights to discredit the self-serving testimony of Mr. Medina (chair of Ad Hoc Board), and instead rely on undisputed public reports that the former U.S. president granted Guaidó access to "U.S. bank accounts containing billions belonging to the state-owned oil company PDVSA," JA5996; JA44 (¶ 83), and evidence at trial that Guaidó approved CITGO funds to be used for government expenses and there is much "commingling going on" between Venezuelan and PDVSA funds, JA8456-57 (Tr. 160:12-161:24). Appellants also ignore the Gomez expert report showing comingling of funds. JA44 (¶ 84) (citing Gomez Report ¶ 22). Moreover, a "loan" from a state *oil* entity is itself irregular. Appellants' case *EM Ltd.* discounted a loan taken from the state's *central bank* as alter-ego evidence, 800 F.3d at 93-94, but no case supports using a state's oil instrumentality as a piggybank.

- Appellants attempt to downplay the many statements made by the Interim Government that PDVSA's assets and debts *are the Republic's assets and debts* as mere "isolated statements," Venezuela.Br.31, or "rhetorical short-hand" that must be "understood in the context of these exigent circumstances," PDVSA.Br.36-37. But they provide no reason to doubt (let alone find clear error in) the district court's finding that these statements—including from Guaidó himself, JA44 (¶ 85)—reflect reality. And PDVSA concedes Venezuela will renegotiate PDVSA's debt on its behalf, simply calling this plan an "isolated policy paper." PDVSA.Br.38. One wonders, in Appellants' view, how many "isolated" statements, payments, policy papers, and agreements there must be before they indicate control.

- And Appellants do not even attempt to challenge other evidence: including PDVSA needing prior authorization for transactions and Venezuela controlling the enforceability of PDVSA's bonds and debt. JA45 (¶¶ 86-88); JA50 (¶¶ 111-12).

*ii. PDVSA's U.S. Profits Go to Venezuela.* It is undisputed that, "[a]s PDVSA's loan shareholder, all profit" goes to Venezuela. *Crystallex II*, 932 F.3d at 148. Appellants say this fact is irrelevant, but this Court already disagreed. *See id.* On its face, it satisfies this factor.

Appellants try to change the factor, claiming it is not satisfied unless the government "take[s] the enterprise's profits in a manner that disregards corporate formalities," Venezuela.Br.33, or imposes "extraordinary fiscal obligations on PDVSA," PDVSA.Br.38 (citing *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365-66 (3d Cir. 2018), a non-*Bancec* case applying a completely different standard). The question here is whether PDVSA's "profits go to" Venezuela. *Crystallex II*, 932 F.3d at 148. Indisputably, they do.

Moreover, even if this factor required commingling or disregarding corporate structures (it does not), Appellants ignore specific evidence of commingling in the record. *See, e.g.*, JA44 (¶ 83) (Guaidó taking money from PDVSA's subsidiaries, "bypassing PDVSA's corporate right to dividends"); *id.* (¶ 94) (Venezuela treats PDVSA's assets as *its assets*—not something a shareholder can do).[7]

***iii. Venezuelan Officials Manage PDVSA and Have a Hand in its Daily Affairs.*** Not only did the Interim Government appoint PDVSA's Ad Hoc Board, it has the right to remove Board members at will, to issue "directives" to the Board, JA46-47 (¶¶ 96-98), and to "act by special decree and by suspending all rights and authorities vested in the Ad Hoc Board, the shareholders' meeting, and the Presidency of PDVSA and its affiliates," JA48 (¶ 102); *id.* (¶ 104) (noting PDVSA must implement its legal strategy in coordination with the government's Special Attorney).

In practice, the Interim Government exercises this control on behalf of Venezuela by requiring prior approval of PDVSA's contracts, legal strategies, and affiliate directors. JA47 (¶ 99). The National Assembly must approve any contract with a foreign national, *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 2020 WL 6135761, at *6-7 (S.D.N.Y. Oct. 16, 2020); JA49 (¶ 107); and the

---

[7] This Court also noted in *Crystallex II* that the government charged PDVSA "extraordinary taxes," but gave no indication that was required. 932 F.3d at 148.

government formulated PDVSA's "litigation and negotiation strategy over the bonds," arguing the bonds were invalid *ab initio* because they were not approved by the National Assembly.  JA49 (¶¶ 108-09).

Perhaps most revealing (and totally inconsistent with a mere shareholder relationship), PDVSA's Ad Hoc Board "only paid its debts in May 2019 after the Guaidó Government authorized such payments"—and then "stopped paying its debts" on instructions from the government in October 2019.  JA50 (¶¶ 111-12); *see Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 61 (2d Cir. 2021) (treating instrumentality's debt as interchangeable with state debt evidences control).

Venezuela's brief is hyper-focused (at 33-36) on the Transition Statute and other documents—but ignores the actual control through directing whether and when to repay debts, approving (or not) bonds, and requiring prior approval for all contracts.  And while these documents purport to remove power from the Maduro regime over PDVSA, they (indisputably) have failed to do so abroad.  Moreover, the Interim Government wresting power over PDVSA from Maduro would *support* a finding of Venezuelan control.  *See* JA46-47 (¶¶ 95-100).

PDVSA, for its part, asserts (at 30) that there is no evidence that the Interim Government "interfere[d] in and dictate[d]" the Board's business decisions.  But it can only argue as much by ignoring evidence relied on by the district court—including the Guaidó government's refusal to honor bonds that it did not approve,

inserting itself into PDVSA's legal strategy,[8] and authorizing and deauthorizing PDVSA's debt payments at will.  PDVSA also cherry-picks (at 29) a few facts that are different between Maduro and Guaidó, but just because the Guaidó government behaves differently than Maduro does not mean that it does not also control PDVSA's operations in the United States.  As the district court found, it does.

*iv. Venezuela is the Real Beneficiary of PDVSA's U.S. Conduct.*  The district court found a host of evidence that the Interim Government treats PDVSA assets as assets of Venezuela.  *See* JA50-52 (¶¶ 113-19) (citing several statements, including from Guaidó, making clear that PDVSA's assets are "the assets of our Republic").  That evidence—along with Venezuela using PDVSA's funds for its own legal defense, controlling PDVSA's bonds and debt repayment, and not stopping PDVSA supplying oil to other countries—makes clear that PDVSA's conduct really benefits the state.  *Id.*

In response, Appellants try to change the factor, insisting the corporation must *hurt* its own interests to help the government for the factor to be satisfied.  Venezuela.Br.37; *see* PDVSA.Br. 25 (claiming the "ad hoc board acts in PDVSA's economic interest").  That is not the question.  The question is whether Venezuela is

---

[8] PDVSA attempts to explain (at 31) *why* the Guaidó government is overseeing PDVSA's legal strategy and expenses and *why* PDVSA is using Venezuelan funds, but the reason is irrelevant.  What matters is that the Guaidó government is exercising this sort of management of PDVSA's operations.

the real beneficiary of PDVSA's conduct.  According to both Guaidó and PDVSA, the answer is yes.  JA50-52 (¶¶ 113-18); JA68; *see Bancec*, 462 U.S. at 625-26 ("the instrumentality's assets and liabilities must be treated as distinct from those of its sovereign").

*v.    Adherence to Separate Identities Would Entitle Venezuela to U.S. Benefits While Avoiding its Obligations.*  Of course, this factor supports an alter-ego finding.  Despite its participation in this appeal, Venezuela continues to shirk the approx. $600 million judgment it owes OIEG, which has been affirmed by U.S. courts.  As this Court explained in *Crystallex II*:  "Any outcome where [a creditor] is not paid means that Venezuela has avoided its obligations.  It is likewise clear from the record that PDVSA, and by extension Venezuela, derives significant benefits from the U.S. judicial system," including because its "2020 bonds are backed by the common stock and underlying assets of U.S.-based corporations," giving "assurance to investors who buy PDVSA's debt."  932 F.3d at 149.  Neither Venezuela (at 38-40) nor PDVSA (at 40-42) dispute that the same logic applies with equal force here.

PDVSA simply argues (at 41) that it did not "benefit[] from the events giving rise to the judgments against the Republic."  But this Court already held that is not required.  *See Crystallex II*, 932 F. 3d at 143 ("*Bancec* does not require a connection between a sovereign's extensive control of its instrumentality and the plaintiff's

injury."). The Court did observe that such evidence would make the equities favor an alter-ego finding even more, but it by no means hinged its decision on that fact. *See id.* at 149.

The equities here plainly require payment: (i) Venezuela concededly owes a massive judgment to OIEG, (ii) it refuses to pay that judgment, (iii) its consistent position is that PDVSA's assets are its assets, and yet (iv) it now argues that PDVSA's assets should not be used to satisfy the judgment. Venezuela wants to have its cake (access to and benefits from U.S. courts) and eat it too (refuse to pay U.S. judgments against it). Moreover, PDVSA's citation-free assertion (at 41) that the Interim Government has promised to pay judgments against Venezuela is cold comfort given that it *has not done so*—and is litigating this case to deprive OIEG of recovery.

*    *    *

In sum, Venezuela exercises excessive control of PDVSA both in and out of the United States. The Court should affirm that PDVSA was at all relevant times, and remains today, an alter ego of Venezuela.

### D.    In The Alternative, The Court Should Affirm the Alter-Ego Finding Because the Pertinent Time Is the Date of Injury.

There is no dispute that PDVSA was an alter ego of Venezuela in 2010 when OIEG incurred harm, or that at that time and through the decision in *Crystallex I*, the assets in question were properly viewed as assets of judgment-debtor Venezuela.

45

333 F. Supp. 3d at 406 ("PDVSA is the alter ego of Venezuela."). So, if the pertinent time for determining alter ego is the date of the injury that gave rise to the creditor's judgment, it cannot be disputed that the same, affirmed alter-ego finding from *Crystallex I* must apply here under settled principles of collateral estoppel. *See United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 316 (3d Cir. 2019) (listing collateral estoppel factors).

Despite the district court's opinion that the pertinent time is the filing of the attachment motion or later, case law reveals that the pertinent time for alter-ego analysis is when the injury occurred. *See, e.g.*, *Groden v. N&D Transp. Co.*, 866 F.3d 22, 30 (1st Cir. 2017) (plaintiff could state an alter-ego claim under ERISA by "claiming that [one company] was [another's] alter ego when the withdrawal liability arose"—that is "at the times pertinent"); *Energy Marine Servs., Inc. v. DB Mobility Logistics AG*, 2016 WL 284432, at *1, *3 (D. Del. 2016) (analyzing whether parties were alter egos "[d]uring the relevant time frame," i.e., when the injury occurred, even though there was no arguable alter-ego relationship at time of suit).

Several other courts also have held that "the relevant time period" for deciding questions related to alter-ego status or corporate veil-piercing "is the time at which the corporation incurred liability." *Trs. of Nat'l Elevator Indus. Pension v. Lutyk*, 140 F. Supp. 2d 447, 457 (E.D. Pa. 2001), *aff'd*, 332 F.3d 188 (3d Cir. 2003); *see*

*J.M. Thompson Co. v. Doral Mfg. Co.*, 324 S.E.2d 909, 915 (N.C. 1985) ("[F]or the alter ego doctrine to be satisfied, it must be shown that control was exercised at the time the acts complained of transpired."); *Moran v. Johns-Manville Sales Corp.*, 691 F.2d 811, 817 (6th Cir. 1982) ("It is agency at the time of the tortious act, not at the time of litigation, that determines the corporation's liability."); *CM Corp. v. Oberer Dev. Co.*, 631 F.2d 536, 539 (7th Cir. 1980) (considering whether there was "evidence that [companies] were shells or sham corporations during the period when appellants and their assignors were dealing with them").

This Court has stated there is "no authority for th[e] proposition" that "the relevant time for a *Bancec* analysis of the relationship between a sovereign and its instrumentality is the moment the writ is issued." *Crystallex II*, 932 F.3d at 144; *id.* at 150 (noting, in the separate but related context of the FSIA commercial activity exception, that "narrowing the temporal inquiry to the day the writ is executed unnecessarily leaves room for manipulation"). Nor is there any authority for Appellants' arguments, Venezuela.Br.40-41; PDVSA.Br.42, or the district court's opinion, JA74-75, that the pertinent time is between the motion seeking a writ of attachment and the issuance of the writ.[9]

---

[9] Venezuela cites one irrelevant case that analyzed a separate provision of FSIA dealing with removal that required majority ownership interest at the time of suit. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003).

Here, the misunderstanding regarding the "pertinent time" could result in conflicting outcomes between two judgment creditors seeking attachments on *the same assets* for harms that Venezuela caused *nearly contemporaneously* at a time when, all agree, Venezuela dominated and comingled funds with PDVSA. OIEG was injured in March 2010 and obtained the OIEG Award in 2015. Crystallex was injured in 2011 and obtained its arbitration award in April 2016. Equity requires that judgment creditors can expect consistent rulings on identical issues—especially, as here, where the assets at issue have never changed hands and are already subject to an identically constructed alter-ego attachment motion (and have, in fact, already been attached).

Nor does it make any sense to allow Venezuela, which indisputably dominated PDVSA and treated its assets as the country's—intermingling them as this Court discussed in *Crystallex II*—in 2010 when it injured OIEG, to later manipulate the court system by (supposedly) removing some control and thereby avoiding any payment on the creditor's judgment.

Thus, even if the Court were to hold evidence of control lacking for the 2019-2022 time period (it should not), it should still affirm the alter-ego finding based on collateral estoppel given OIEG's 2010 injury.

**II.    As Venezuela's Alter Ego Under Federal Law, PDVSA's Property Is Subject to Attachment to Satisfy Venezuela's Judgment Debts.**

As a last-ditch effort to avoid attachment, Venezuela and PDVSA argue that Delaware law somehow bars attachment of PDVSA's property even though the federal-law alter-ego test under the FSIA has been satisfied.  *See* Venezuela.Br.42-56; PDVSA.Br.48-55.  That argument conflicts with *Bancec*, this Court's decision in *Crystallex II*, and the text of Rule 69 itself—and should be soundly rejected.[10]

Under Rule 69(a) the "procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  Fed. R. Civ. P. 69(a).  Here Delaware law specifically provides that a creditor may attach a judgment debtor's shares in a Delaware corporation to satisfy the debt owed.  *See* 8 Del. C. § 324.  And judgment creditors may execute on their judgments by garnishment, a process for attaching the defendant's property that is held by a third party.  10 Del. C. § 5031; *see also Wilmington Tr. Co. v. Barron*, 470 A.2d 257, 263 (Del. 1983) ("The authority for [attachment on property not in a debtor's possession] is founded upon 10 Del. C. § 5031.").

---

[10] In addition to the arguments here, OIEG also incorporates the arguments in Appellee ACL's contemporaneously filed brief.

These are Delaware procedures that, under Rule 69(a), allow the Court to attach Venezuela's shares, even if they nominally belong to PDVSA. These procedures also reveal, contrary to PDVSA's assertion, that the shares it nominally holds can be attached even though "Plaintiffs only hold judgments against the Republic." PDVSA.Br.53. As shown above, under *Bancec*, those shares are actually the property of Venezuela and can be attached via Delaware's garnishment process even if nominally in the hands of a third party.

In an attempt at a second bite at the alter-ego apple, Appellants try to use Federal Rule of Civil Procedure 69 to import not just those procedures but Delaware's test for alter-ego liability itself. That argument should be easily rejected.

As an initial matter, Appellants contradict this Court's prior holdings and their own prior arguments. In *Crystallex II*, this Court held that "federal common law" allows alter-ego liability based solely on "extensive control" without proof of fraud. 932 F.3d at 132, 145. The Court further stated that *Bancec* can "be used to reach the assets of a foreign sovereign's extensively controlled instrumentality through post-judgment attachment proceedings," and thus "determine[s] 'whether the [instrumentality's] assets … are subject to execution'" and whether this Court has "power to issue a writ." *Id*. at 139. Those statements make clear that the Court did not view *Bancec*'s framework as applying only to the jurisdictional and immunity questions (as Appellants contend). Rather, they establish that attachment of the writ

is warranted upon an FSIA alter-ego finding.  Moreover, this Court recognized that "[b]efore it lost its prior appeal, PDVSA conceded that 'the legal standard for alter-ego … applied in this case [is] federal common law.'"  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 248 n.2 (3d Cir. 2022); *see also* Br. for Crystallex Int'l Corp. as Amicus Curiae, ECF No. 59, at 7-15 (recounting Venezuela and PDVSA's prior arguments conceding the *Bancec* factors apply to the merits question, and this Court holding as much).

Even if Appellants' arguments were not foreclosed by the clear holding in *Crystallex II* and Appellants' clear waiver, they are inconsistent with Rule 69.  That rule incorporates "only local procedure," not local substantive laws.  *Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 480 n.18 (D.C. Cir. 2016) (expressing "reservations" about applying a state law bar to attachments where the state law could be "outcome determinative.").

Rule 69(a) also does not apply if a federal statute applies, or if the state law "conflict[s] with federal law."  *Weininger v. Castro*, 462 F. Supp. 2d 457, 492 (S.D.N.Y. 2006).  Such a conflict exists here because Appellants suggest that application of Delaware's alter-ego analysis would be different than the federal *Bancec* factors.  Under *Bancec* the relationship between a foreign state and its instrumentalities is governed by principles "common to both international law and federal common law," not "the law of the forum State."  462 U.S. at 622 n.11, 623;

*see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 448 (D.C. Cir. 1990) (*Bancec* stands for the proposition that "international law and federal common law determine … when instrumentalities should not be treated as distinct from the sovereign."); *Jarvey v. Libyan Inv. Auth.*, 840 F.3d 248, 264 (5th Cir. 2016) (A claim to "overcom[e] the presumption that [a foreign state] instrumentality … is separate from the foreign state" is analyzed "with reference to federal law, not foreign law or state law."). *Bancec* applies generally to determine where "the presumption that a foreign government's determination that its instrumentality is to be accorded separate legal status" may be "overcome in certain circumstances." *Bancec*, 462 U.S. at 628.

Moreover, Congress has implicitly incorporated the *Bancec* factors into the FSIA itself, so the Rule's explicit prohibition of using state law that conflicts with a federal statute applies.  The Supreme Court recognized in *Rubin* that Congress' decision to abrogate the *Bancec* factors as to certain judgments shows a congressional intent that they remain applicable to other judgments like those here. 138 S. Ct. at 823 ("Subparagraphs (A) through (E) incorporate almost verbatim the five *Bancec* factors," abrogating *Bancec* in the context of a § 1605A judgment holder, but not in any other circumstance).  Thus, the FSIA *does* have an implicit standard for how a foreign sovereign's relationship to its instrumentalities is governed—distinguishing this case from *Republic of Argentina v. NML Capital,*

*Ltd.*, which concluded, in applying state law to post-judgment discovery, that the FSIA did not apply because it did "not contain implicit discovery-immunity protections." 573 U.S. 134, 143 n.3 (2014). According to *Rubin*, it is just the opposite here.

Appellants cite no authority supporting their novel position that Delaware law applies to the alter-ego question here.[11] They cite no cases where any court has applied a state's veil-piercing test to the relationship between a foreign sovereign and its instrumentality, let alone any in which the application of the state test conflicted with *Bancec*. Many of the cases Defendants cite do not involve veil piercing at all. *See Hendricks & Lewis PLLC v. Clinton*, 766 F.3d 991, 996 (9th Cir. 2014); *Pac. Reinsurance Mgmt. Corp. v. Fabe*, 929 F.2d 1215, 1219 (7th Cir. 1991). That includes the cases Appellants cite involving foreign sovereigns, which involved issues not presented here, such as the location of intangible property, *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1131 (9th Cir. 2010); *Walker Int'l Holdings, Ltd. v. Republic of Congo*, 415 F.3d 413, 416 (5th Cir. 2005), award of

---

[11] Appellants' reliance on *Cassier v. Thyssen-Bornemisza* is misplaced. *Cassirer* stands for the long-understood proposition that choice-of-law analysis "relating to property, torts, contracts and so forth" is no different in a case involving a foreign sovereign. 142 S. Ct. 1502, 1507 (2022) ("The Ninth Circuit stands alone in using a federal choice-of-law rule to pick the applicable substantive law."). As *all* courts have held, federal common law, "informed by international law principles and by articulated congressional policies" displaces state-created rules through *Bancec* in the foreign sovereign alter-ego context. *See* 462 U.S. at 622 n.11, 623.

attorney's fees, and a sovereign's interest in certain property (not involving veil piercing). *See EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 473 (2d Cir. 2007); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 83 (2d Cir. 2002). Appellants' cases that do involve state veil-piercing standards do not involve the property of foreign sovereigns. *See Katzir's Floor & Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1148 (9th Cir. 2004); *Sys. Div., Inc. v. Teknek Elecs., Ltd.*, 253 F. App'x 31, 34 (Fed. Cir. 2007); *Tr. v. Kummerfeld*, 153 F. App'x 761, 762-63 (2d Cir. 2005).

Appellants' lack of support is unsurprising, since applying state alter-ego standards in this context runs headlong into concerns that "matters bearing on the nation's foreign relations 'should not be left to divergent and perhaps parochial state interpretations.'" *Bancec* 462 U.S. at 622 n.11 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964)). These concerns for uniformity outweigh any concern raised by PDVSA (at 50 n.5) that the alter-ego test is more stringent under Delaware law than federal law. *Bancec* itself rejected the argument that 28 U.S.C. § 1606—which provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances"—required adoption of state law corporate separateness rules. 462 U.S. at 622 n.11. If it did, then a foreign sovereign could be subject to up to fifty different state rules concerning the relationship between it and its instrumentalities. In these

circumstances, as *Bancec* recognized, a uniform federal standard is needed. *See, e.g.*, *Hines v. Davidowitz*, 312 U.S. 52, 68 (1941) (describing "international relations" as "the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority").

Moreover, refusing to allow OIEG to attach here would be inequitable because OIEG is, in every meaningful respect, situated like Crystallex. Its assets were expropriated by the same rogue state that expropriated Crystallex's mine. Each creditor sought and obtained an ICSID award. Against one, Venezuela more successfully deployed delay tactics through its unsuccessful "annulment" effort. But that is the only difference. Like Crystallex, OIEG promptly sought judicial relief. Without a writ of attachment, one creditor (Crystallex) would be left with recourse, while OIEG and the others are denied.

## CONCLUSION

For these reasons, the Court should affirm.

Dated: May 24, 2023

Respectfully submitted,

*s/ David B. Salmons*

Edward H. Davis Jr.
Fernando J. Menendez
Sequor Law, P.A.
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
(305) 372-8282

David B. Salmons
James D. Nelson
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000

Christopher L. Carter
Jonathan M. Albano
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110-1726
(617) 951-8063

*Counsel for Appellee*
*OI European Group B.V.*

## COMBINED CERTIFICATES OF COMPLIANCE

In accordance with Local Appellate Rules 28.3(d) and 46.1(e), I certify that all attorneys whose names appear on this brief are members in good standing of the bar of this Court or have filed an application for admission.

In accordance with Local Appellate Rule 31.1(c), I certify that the texts of the electronic brief and paper copies are identical and that Microsoft Defender Offline scanned the file and did not detect a virus.

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,881 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), according to the word count of Microsoft Word 365. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in Times New Roman 14-point font, a proportionally spaced typeface.

Dated:  May 24, 2023

*s/ David B. Salmons*
David B. Salmons

*Counsel for Appellee*
*OI European Group B.V.*

## CERTIFICATE OF SERVICE

I hereby certify that counsel for all parties are registered as Filing Users of the Court's CM/ECF system and that a copy of this Brief of Appellee will be served electronically on this date by operation of the Court's CM/ECF system.

Dated:  May 24, 2023

*s/ David B. Salmons*
David B. Salmons

*Counsel for Appellee*
*OI European Group B.V.*